[No. B217438. Second Dist., Div. Four. Nov. 2, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
TYRONE BALDWIN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts B. and C. of the Discussion.

**COUNSEL**

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WILLHITE, Acting P. J.**—A jury convicted defendant Tyron Baldwin of murder (Pen. Code, § 187, subd. (a)) and conspiracy to commit murder (Pen.

Code, § 182, subd. (a)(1)), and found true gun and gang allegations as to each count (Pen. Code, §§ 12022.53, subds. (c), (d), (e)(1), 186.22, subd. (b)(1)(A)). It acquitted him of attempted murder (Pen. Code, §§ 664, 187, subd. (a)). The trial court imposed a sentence of 25 years to life on the first degree murder, plus a consecutive 25 years to life on the gun allegation (Pen. Code, § 12022.53, subd. (d)), and stayed the sentence on the conspiracy and gang enhancement under Penal Code section 654.

On appeal, defendant contends the trial court erred by denying his challenges to several potential jurors for cause. Although we acknowledge there are Supreme Court decisions, which have not been expressly overruled or disapproved, that support defendant's argument that we must examine those trial court rulings even though none of the potential jurors actually sat on the jury, we follow a subsequent Supreme Court ruling that concludes no examination is necessary where, as here, defendant did not challenge for cause any of the jurors who sat on his case.

Defendant also raises issues related to the admission of recordings of jail cell conversations in which defendant and another coconspirator made statements implicating defendant in the murder. One of those issues addresses the trial court's ruling that, unless he testified at trial, defendant could not introduce hearsay evidence of statements defendant made in other settings that were inconsistent with statements he made on the jail cell recordings. Although we conclude that, under the plain language of Evidence Code section 1202, defendant was entitled to introduce evidence of his inconsistent statements even though he was available to testify at trial, any error in excluding the evidence was harmless. Accordingly, we affirm the judgment.

## BACKGROUND

*Prosecution Evidence*

On the morning of June 28, 2005, Jiovanni Jones was at an apartment, in an area of Los Angeles known to be Rolling 20's Blood gang territory, with his brother and his friend James Lane. Lane, who was not a member of the Rolling 20's gang, sold marijuana from that apartment. The apartment had a security system in which cameras fed images of the exterior of the apartment to a monitor inside the apartment. At one point, Jones saw two Black men on the monitor; the men were pacing in front of the building and looking around.[1] He and Lane went outside and he saw three people getting into a

---

[1] When questioned on cross-examination, Jones testified that his brother actually saw the men on the monitor, but on redirect he said that his brother saw them and directed his attention to the monitor, and that he then saw them on the monitor.

truck (later identified as a blue Suburban SUV) that was being driven by a fourth man. Two of the people getting into the truck were the two men Jones had seen on the monitor.

A short while later, Jones and Lane left the apartment to walk to a gas station down the street. As they were walking, they saw the three people Jones had earlier seen getting into the truck walking toward them. The three men looked like "gang bangers," so Jones and Lane turned around and started walking back toward the apartment. As soon as they turned around, Jones heard someone say "Hey," and then he heard a shot. Jones looked back and saw Lane on the ground and one of the three men pointing a gun at him (Jones). Jones ran toward the apartment, and heard three more shots. He went to the apartment, got his brother, and left.

The shooting was witnessed by a passerby, Jorge Melendez, who was driving near the gas station when he saw three young Black men cross paths with two other young Black men. One of the three men turned around and shot one of the two men in the back of the head.[2] As the victim's companion ran away, the shooter fired a shot after him, then the three men walked back toward the gas station. Melendez made a U-turn and tried to find the three men, but he lost sight of them. He turned down one of the streets, and saw a blue SUV speed onto the street in reverse and head south. He tried to get close to the SUV to see if the three men were in it but he could not get close enough. He noted that the SUV did not have a license plate (it only had a paper plate from a car dealer) and was missing a hubcap. He turned around when he saw the SUV get on the freeway, and went back to the gas station to call the police.

When police arrived at the scene, they found Lane dead from a gunshot wound to the head. He had been shot from behind, just above the left ear, from between one and two feet away. He still had on his person two cell phones, $704.93 in cash, a bag of marijuana, a wallet, keys, a ring, and a dog tag type of necklace.

About an hour later, the police located an SUV matching Melendez's description parked on a street several blocks away. The car's owner, Margaret Cook, met the police at that location (which was near her apartment). She told them she had bought the SUV a few months earlier for her boyfriend, Bill Lennan[3]—who was also known as "O Dog" or "Old Dog"—to drive. She gave the police permission to search her apartment, where they found, among

---

[2] When asked by defense counsel at trial, Melendez testified that he believed the shooter fired the gun with his right hand. Defendant testified that he was left-handed.

[3] Lennan's name is sometimes misspelled in the reporter's transcript as "Lennon"; the correct spelling is Lennan.

other things, a diagram she had never seen before, in the bedroom on a nightstand near other papers belonging to Lennan. It was later determined that the diagram was of the apartment from which Lane sold marijuana. Cook subsequently identified Lennan from a photo lineup, as well as a friend of Lennan's she knew as "War Time." Lennan and "War Time" (whose real name is Evan Thurton) are members of the Rolling 20's gang.

The day after the shooting, at Lane's wife's urging, Jones went to the police and told them what had happened. Jones was shown a photo lineup from which he identified Lydell Powell as one of the three men who approached him and Lane the day before. Several days later, the police showed him some other photo lineups, from which he identified defendant as the shooter and Thurton as the other person who was with the shooter.

Defendant, Powell, and Thurton were arrested and were placed at various times in a jail cell that contained a recording device. At trial, the prosecutor played portions of the recordings. At times defendant was alone in the cell with Darris Wells, who had been arrested on charges unrelated to the instant crime, and at other times he was in the cell with both Wells and Thurton; he was never in the cell with Powell. Sometimes Thurton or Powell was alone in the cell with Wells. On those recordings, Thurton and defendant are heard trying to reassure themselves that the police do not have any evidence against them and that they will be okay as long as the police do not find Lennan and no one talks to the police. In many of those conversations, they make statements that implicate them in the shooting.

For example, defendant said that the police told him there was a camera that showed them, but he said, "If they had a camera . . . they would have came and got us right then. The following day type shit. . . . [¶] Or at least in that same week."[4] Similarly, Thurton and defendant agreed that the police must have no witnesses to the shooting, because if they did, "we'd already be fucked" and would have been brought to court right away.

They also expressed their belief that they were safe as long as the police did not find "Old Dog," i.e., Lennan. At one point, Thurton (who was arrested a few hours before defendant) told defendant, "I already know when they charged me I'm like they're going to get you because they can't catch the dog [(i.e., Lennan)]. They can't catch the dog. . . . [I]f they don't catch the

---

[4] There was a subsequent discussion among defendant, Thurton, and Wells about the possibility that the police might have gotten recordings from a camera. Defendant was speculating about which camera it might have been, and Wells assured him it could not have been the cameras from Lane's drug spot, because in every drug spot he had been to (including his own), the cameras were there only to see the outside and there were no recording devices hooked up to them.

dog, homey, they don't have no case." Later, Thurton reiterated his concern about Lennan, saying, "I just hope that they don't catch Old Dog, dog." Defendant responded, "Me, too. Because they can't really—they can't—they can't do nothing without—with us, without Blood."

At another point, defendant and Thurton talked about how important it was that no one talk to the police. Thurton commented to defendant, "The only way they got something on us is if the niggers start talking. You know what I mean? . . . [¶] They don't have no guns or nothing. They don't have no evidence." Defendant responded, "That's why I'm happy. So that's why I'm like, I ain't tripping. Look, we got all that is gone, everything." Still later, defendant said, "Nobody breaks, we're cool."

Defendant seems to incriminate himself in other conversations as well. In one conversation, defendant said that the police showed him something (most likely a photo six-pack) in which his booking photo from an earlier arrest was circled, and he appears to be bemoaning the fact that the way he wore his hair at the time of the shooting was the same way he wore it in the earlier booking photo. In another conversation, defendant tells Thurton that defendant's mother was concerned that defendant had left a gun or other evidence in her house. Defendant reassured her that there was no pistol and "no bullets to that pistol" in her house, although he told Thurton that he had kept "the 380 bullets for the automatic" at the house before he got rid of them. But he said he did not need to worry because if the police found anything, it would be a single bullet, and "it's not to the revolver, it's to an automatic."

Finally, defendant and Thurton both talked directly about their involvement in the shooting. Indeed, defendant boasted to Wells that he shot Lane, saying, "nigger, when I popped Blood, I hit Blood there in the temple. . . . [¶] Boom. Gone. I think—I was right there in front of him when I hit him. . . . I hit that nigger right there. I didn't even feel guilty." Later, he described how it happened in more detail: "[W]e see both of them walking. . . . [W]e exchange a few words, nigger pass us up, I run up on a nigger, bam. Grab the other nigger's chain, shirt. Then he say somebody to his homeboy. Homeboy automatically going for his pistol to turn around. As soon as I see that, I pop left. Pop. I didn't even take off running. Blood laying on the ground."

Thurton confirmed that defendant was the shooter in a conversation he had with Wells when they were alone in the cell. He told Wells, "My homey gunned down to that—them. My little homey. . . . [¶] My little homey nigger, my little gangster homey. I'm like, nigger, yeah, homey, handle that bitch-ass nigger because I was going to handle it." During that conversation, Wells seemed to indicate that Powell also had confirmed defendant's version of events, because Wells said to Thurton, "homeboy came out with a

burner.[5] . . . [¶] That's what your big homey said. And your little homey was like, fuck this, man. They're going to kill one of us then. . . . [¶] Right on the front door and some shit." Thurton replied, "Gunned him down right in front of his front yard and took his pistol off of his waist." Wells then said, "They—damn. And this nigger brought a gun. And if you didn't burn that fool, that fool was going to burn one of y'all." After discussing the fact that Lane was selling marijuana in Rolling 20's territory, Thurton, who said he had his own "dope spot," said, "I'm like, fuck it, then, dude . . . hurry up and get this nigger out the way."

*Defense*

Defendant testified that, although he was with Thurton and Powell when Lane was shot, Thurton was the person who shot Lane, and he did not know anything about it beforehand; he was just going with them to buy marijuana. He said that he did not go to the police to tell them what happened because he was scared, and he told Wells a different story because he was being pressured by Powell and Thurton to take the rap for the shooting. He admitted that, once he was arrested, he told the police several different stories—from denying he was in the area at all that day and denying any involvement, to admitting he was in the Suburban at various times, to telling the same story he told at trial—but he said he did so because he was scared.

Defendant also called Wells to testify on his behalf. Wells testified that, after Powell was removed from the jail cell they were sharing, Powell was placed in a cell about five feet away. Wells could see Powell in that cell, and saw him making hand signals when defendant was sharing the cell with Wells. Wells also testified that defendant was crying when he told Wells about the murder, and told him that he did not shoot Lane; he said that Powell and Thurton were telling him he should admit the murder, because he was young. Wells admitted on cross-examination, after the jail cell recording was played for him, that it did not sound as if defendant were crying, but he said that defendant had tears coming from his eyes.

## DISCUSSION

Defendant makes four assertions of error on appeal. He contends the trial court erred by (1) denying four challenges for cause during voir dire; (2) admitting Thurton's out-of-court statement that defendant shot Lane; (3) failing to instruct the jury that Thurton was an accomplice whose statement should be viewed with caution; and (4) excluding recordings of inconsistent statements defendant made to the police unless defendant testified. We find no prejudicial error.

---

[5] Teodoro Urena, a sergeant with the Los Angeles Police Department who worked on the case, testified that "burner" is street vernacular for a gun.

## A. *Denial of Challenges for Cause*

During voir dire, the trial court denied four of defendant's challenges for cause. Defendant subsequently used peremptory challenges to remove those prospective jurors. After exhausting his remaining peremptory challenges, he sought additional challenges, which the trial court denied, and expressed dissatisfaction with the jury as empanelled, saying he would have challenged two seated jurors if he had any peremptory challenges available. On appeal, defendant contends the trial court erred by denying his challenges for cause, and that he is entitled to reversal for a new trial because he was deprived of peremptory challenges he would have used to excuse jurors who sat on his case.

In making this contention, defendant relies upon *People v. Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659] (*Bittaker*), a case presenting circumstances similar to the present case. In *Bittaker*, the Supreme Court observed that "[t]he denial of a peremptory challenge to which defendant is entitled is reversible error when the record reflects his desire to excuse a juror before whom he was tried. [Citation.] Since the erroneous denial of a challenge for cause compels the defense to use a peremptory challenge, a similar analysis applies to denial of a challenge for cause. [Citation.] Defendant must show that the error affected his right to a fair and impartial jury. [Citation.] [¶] Thus, defendant must show that he used a peremptory challenge to remove the juror in question, that he exhausted his peremptory challenges [citation] or can justify his failure to do so [citation], and that he was dissatisfied with the jury as selected. But if he can actually show that his right to an impartial jury was affected because he was deprived of a peremptory challenge which he would have used to excuse a juror who sat on his case, he is entitled to reversal; he does not have to show that the outcome of the case itself would have been different." (*Id.* at pp. 1087–1088; see also *People v. Crittenden* (1994) 9 Cal.4th 83, 121–122 [36 Cal.Rptr.2d 474, 885 P.2d 887] (*Crittenden*).)

In reviewing the defendant's contention in *Bittaker*, the Supreme Court did not examine the impartiality of the jurors who actually sat on the defendant's case; instead, it examined only the prospective jurors the defendant attempted to challenge for cause and subsequently excused with a peremptory challenge, to determine whether the defendant was prejudiced by the denial of his for-cause challenge. (*Bittaker, supra,* 48 Cal.3d at p. 1088.) In light of the passage quoted above and the court's examination of only the prospective jurors challenged for cause rather than the sitting jurors, *Bittaker* might be read to hold that, if the defendant can show he was required to use his peremptory challenges to remove jurors as to whom the trial court erroneously denied a challenge for cause, and that he exhausted his peremptory

challenges and thus was unable to excuse one or more jurors who sat on his case, his right to an impartial jury necessarily was affected and he is entitled to reversal. (See also *Crittenden, supra*, 9 Cal.4th at pp. 120–123 [following *Bittaker*, and examining the trial court's denial of challenges for cause of two prospective jurors even though neither prospective juror sat on the defendant's case].)

But in a more recent pronouncement on the subject in *People v. Yeoman* (2003) 31 Cal.4th 93 [2 Cal.Rptr.3d 186, 72 P.3d 1166] (*Yeoman*), the Supreme Court took a different tack. In *Yeoman*, the court was faced with virtually identical circumstances: a defendant who asserted that the trial court erroneously denied four of his challenges for cause, who peremptorily challenged each of those prospective jurors and exhausted his peremptory challenges, and who expressed dissatisfaction with the jury as selected. Nevertheless, the Supreme Court found that "[w]hile the claim is thus properly before us, we may reject it without examining the merits of defendant's challenges for cause because defendant cannot show prejudice." (*Id.* at p. 114.)

■ Without addressing the apparent inconsistency with *Bittaker* (and with *Crittenden*, which followed *Bittaker*), the Supreme Court in *Yeoman* observed that "[t]he harm to defendant, if any, was in being required to use four peremptory challenges to cure what he perceived as the trial court's error. Yet peremptory challenges are given to defendants subject to the requirement that they be used for this purpose. [Citation.] While defendant's compliance with this requirement undoubtedly contributed to the exhaustion of his peremptory challenges, from this alone it does not follow that reversible error occurred. An erroneous ruling that forces a defendant to use a peremptory challenge, and thus leaves him unable to exclude a juror who actually sits on his case, provides grounds for reversal only if the defendant '*can actually show that his right to an impartial jury was affected* . . . .' [(Citing to *Bittaker, supra*, 48 Cal.3d at pp. 1087–1088.)] In other words, the loss of a peremptory challenge in this manner ' "provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*" ' [Citations.] Here, defendant cannot show his right to an impartial jury was affected because he did not challenge for cause any sitting juror. No incompetent juror was forced upon him." (*Yeoman, supra*, 31 Cal.4th at p. 114.)

■ The effect of this analysis in *Yeoman* is that the only for-cause challenges that are relevant on appeal are challenges made to *sitting* jurors. That is, even if the trial court erroneously denied for-cause challenges to *prospective* jurors who were later excused by peremptory challenges, the defendant cannot show that his right to an impartial jury was affected by the

denial of the for-cause challenges, unless the trial court erroneously denied a challenge for cause to a sitting juror. (See *People v. Avila* (2006) 38 Cal.4th 491, 540 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [declining to examine prospective jurors defendant contended should have been dismissed for cause because none of them sat on the jury].) This seems to depart from the analysis in *Bittaker* and its progeny, under which the court suggested that a defendant preserves a claim of trial court error in failing to excuse a juror for cause by (1) exercising a peremptory challenge against the juror in question, (2) exhausting all peremptories, and (3) expressing dissatisfaction with the jury as finally empanelled. (*Bittaker, supra,* 48 Cal.3d at p. 1087; see also *Crittenden, supra,* 9 Cal.4th at p. 121; *People v. Weaver* (2001) 26 Cal.4th 876, 910–911 [111 Cal.Rptr.2d 2, 29 P.3d 103].) Indeed, under *Yeoman,* by satisfying the first requirement of *Bittaker* (exercising a peremptory challenge to the juror who purportedly should have been excused for cause), the defendant necessarily renders any possible error with respect to *that juror* nonprejudicial. Although the Supreme Court did not acknowledge this effect when it decided *Yeoman,* or in subsequent cases that followed it (see, e.g., *People v. Bonilla* (2007) 41 Cal.4th 313, 340 [60 Cal.Rptr.3d 209, 160 P.3d 84] [applying *Yeoman* and declining to address defendant's claim of error with regard to prospective jurors who did not sit on jury because record did not show that any sitting juror was challenged for cause]), it appears it has impliedly disapproved *People v. Bittaker, supra,* 48 Cal.3d 1046 to the extent *Bittaker* might be read to hold that a defendant may establish that his right to an impartial jury was affected if he shows that he wanted, but was unable, to excuse one or more jurors who sat on his case (none of whom he challenged for cause) because he had to use peremptory challenges to remove jurors who should have been removed for cause.

In the present case, defendant did not challenge for cause any of the jurors who sat on his case, although he expressed dissatisfaction with two of those jurors. Therefore, under *Yeoman,* we need not examine the merits of defendant's challenges for cause because he cannot show prejudice. (*Yeoman, supra,* 31 Cal.4th at p. 114.) But even if we construed defendant's expression of dissatisfaction with two of the sitting jurors as challenges for cause, we would conclude that defendant failed to show that " ' "an incompetent juror [was] forced upon him." ' " (*Ibid.,* italics omitted.) On appeal, defendant does not attempt to show that one of the two jurors he wished to excuse was biased, but argues that the other—Juror No. 11—was biased because the juror revealed that his friend's nephew had been killed by a gang member. But the juror said that he did not know the nephew, and he did not believe there was anything about that incident that would make it difficult for him to sit on defendant's jury. Defense counsel made no further inquiry into the effect of that incident on the juror's ability to be impartial. Thus, the record does not come close to showing that defendant was prejudiced by the inclusion of this

juror on his jury; a juror's mere knowledge that someone he did not know was killed by a gang member in an incident he did not witness does not, by itself, make that juror incompetent to serve on a jury involving a gang-related murder. (Cf. *People v. Stewart* (2004) 33 Cal.4th 425, 445 [15 Cal.Rptr.3d 656, 93 P.3d 271] [there must be sufficient information regarding a juror's state of mind to permit a reliable determination as to the juror's competence].) Because defendant did not show that an incompetent juror was forced upon him, his assertion of reversible error necessarily fails. (*Yeoman, supra*, 31 Cal.4th at p. 114.)

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D. *Exclusion of Defendant's Inconsistent Statements Unless He Testified*

As we have noted, at trial the prosecution played portions of jail cell recordings containing statements by defendant in which, among other things, he said that he was the shooter. Defense counsel then sought to introduce evidence, including recordings, of inconsistent statements that defendant made to the police, in which he ultimately claimed (as he testified at trial) that he was present when the killing occurred, but did not participate. Although defense counsel originally cited to Evidence Code section 1235[9] in support of his request, he later corrected himself, and said he was entitled to introduce the inconsistent statements under section 1202 with a proper limiting instruction that the statements "are not being offered for the truth of the matter but for the limited purpose of showing the credibility of the person [(defendant)] making the statements." The trial court sustained the prosecution's objection to the evidence on hearsay grounds, finding that defendant could not introduce evidence of his inconsistent statements unless he testified.[10] Defendant challenges this ruling on appeal, arguing he was entitled to introduce those inconsistent statements without having to testify. We agree that the trial court erred by excluding those statements unless defendant testified, but we conclude that the error was harmless.

---

*See footnote, *ante*, page 991.

[9] Further undesignated statutory references are to the Evidence Code.

[10] Defendant also said he wanted to introduce portions of the jail cell recording in which he purportedly made statements inconsistent with the portions the prosecution played for the jury. The prosecution did not object to their introduction as long as defendant identified which portions he intended to play. The court agreed that defendant had a right to play those portions under section 356, but it insisted that defendant have the recording edited so the excerpts he intended to play for the jury could be easily accessed (the jail cell recording was more than 30 hours long). Defendant did not edit the recording, and did not play any other portions. To the extent defendant argues on appeal that the trial court precluded him from introducing those portions, his argument is contradicted by the record.

Section 1202 provides in its entirety: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing. For the purposes of this section, the deponent of a deposition taken in the action in which it is offered shall be deemed to be a hearsay declarant."

The language of the statute is clear and unambiguous. It does not make the hearsay declarant's unavailability a condition for introduction of the declarant's inconsistent statements offered for impeachment. (See *People v. Corella* (2004) 122 Cal.App.4th 461, 471 [18 Cal.Rptr.3d 770] [§ 1202 does not require a preliminary showing of unavailability, but merely permits impeaching evidence without providing the declarant an opportunity to explain the inconsistency]; *People v. Ross* (1979) 92 Cal.App.3d 391, 406 [154 Cal.Rptr. 783] [same].) Here, the prosecution introduced defendant's statements in the jail recordings as party admissions (§ 1220), and defendant was, within the meaning of the Evidence Code, a hearsay declarant (§ 135). Therefore, by its plain language, section 1202 permitted him to introduce his prior inconsistent statements to attack his own credibility as a hearsay declarant in the jail recordings, even though he was available to testify.

The trial court found, based upon the Law Revision Commission comments to section 1202, that the section is not applicable when the declarant is available to testify. Those comments explain that section 1202 was intended to provide "a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency. If the hearsay declarant is unavailable as a witness, the party against whom the evidence is admitted should not be deprived of both his right to cross-examine and his right to impeach. [Citation.] If the hearsay declarant is available, the party electing to use the hearsay of such a declarant should have the burden of calling him to explain or deny any alleged inconsistencies." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 1202, p. 27 (hereafter Comments).) The trial court interpreted the last sentence to mean that the proponent of *the inconsistent statements* is required to call the declarant if he is available to testify, to allow the declarant to explain or deny the inconsistencies; since defendant was available to testify (if he waived his right not to testify), the court found he must testify in order to have his prior inconsistent statements admitted.

■ We disagree with the trial court's interpretation. Although the Comments might have been clearer on the point, the reference in the last sentence to "the party electing to use the hearsay of such a declarant" means the party who introduced the hearsay statement that is the subject of the impeachment. It does not mean the party against whom the hearsay was used and who seeks to use the inconsistent statement for the *nonhearsay* purpose of impeachment. "The theory is that, if the hearsay declarant is available, the burden of calling the declarant to explain is not on the impeaching party but on the party who used the hearsay statement." (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 358, p. 445.) In any event, the Comments do not trump the unambiguous language of the statute. (*People v. Osorio* (2008) 165 Cal.App.4th 603, 616 [81 Cal.Rptr.3d 167] [noting that the court in *People v. Beyea* (1974) 38 Cal.App.3d 176 [113 Cal.Rptr. 254] improperly "exalted the Comments [accompanying § 1202] over the statutory language," because the language of § 1202 is unambiguous]; *People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1450 [93 Cal.Rptr.2d 783] ["in the absence of ambiguity or conflict, the words employed by the Legislature control, and there is no need to search for indicia of legislative intent"].) And even if there were an ambiguity, the Comments make clear that section 1202 establishes "a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases." (Comments, *supra*, at p. 27.)

■ We recognize that as applied to a case such as this, the statutory language creates what is, at first blush, an odd result: the language permits a criminal defendant to attack his own credibility as a hearsay declarant (here, as a declarant in his recorded confession) by offering evidence of an inconsistent statement (here, a denial of culpability made to the police), even though the defendant is available to testify for the defense but *cannot* be called by the prosecution to be examined about the inconsistent statement. Nonetheless, the statute's plain language permits the credibility of *any* hearsay declarant to be attacked by the introduction of an inconsistent statement made by the declarant, and we cannot say that this result is so incongruous as to create an absurdity justifying a departure from the statutory language. (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698 [8 Cal.Rptr.2d 614] [the "exception [permitting departure from the plain meaning to avoid an absurd result] should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government"].) The theory of relevance for impeaching a witness or declarant with an inconsistent statement is that the hearsay and the inconsistent statement cannot both be true, that one must be wrong, and that, therefore, the person has "some *undefined capacity to err*; it may be a moral disposition to lie, it may be partisan bias, it may be faulty observation, it may be defective recollection, or any other quality." (3A Wigmore, Evidence (Chadbourn ed. 1970) § 1017, p. 993, original italics.) We cannot say that

such logic does not apply when a criminal defendant seeks to cast doubt on his own credibility as a declarant with regard to party admissions introduced against him by the prosecution. That is, from the inconsistency, the jury is permitted to draw the inference that the party admissions used by the prosecution cannot be trusted to be true, either because the defendant has "a moral disposition to lie" or because the defendant has some other quality casting doubt on his accuracy in recounting the subject of the admissions and the inconsistent statement.

█ Further, we understand that the defendant may well hope that the jury will consider the inconsistent statements for their truth even though they are not admitted for that purpose. But such an unexpressed hope does not dispel the relevance of the inconsistent statement for the independent, nonhearsay purpose of casting doubt on the defendant's credibility as the declarant of incriminating party admissions used by the prosecution. Further, as one court observed, "section 1202 embodies the legislative judgment that the jury is able to distinguish between considering hearsay for truth and for impeachment." (*People v. Corella, supra,* 122 Cal.App.4th at p. 471.) As we have noted, in this case, defense counsel made clear that he expected that a limiting instruction would be given to the jury to consider the statements only with regard to defendant's credibility as a declarant.

We emphasize, however, that section 1202 does not give the defendant carte blanche to introduce any and all statements purportedly inconsistent with the party admissions used by the prosecution. The trial court retains discretion under section 352 to regulate the introduction of such evidence. (Comments, *supra,* at p. 27 ["Of course, the trial judge may curb efforts to impeach hearsay declarants if he determines that the inquiry is becoming too remote from the issues that are actually at stake in the litigation."].) It must be remembered that such evidence has limited probative value: it is admissible *solely* to attack the credibility of the defendant as a declarant in the party admissions used against him. When, under the circumstances of the particular case, such probative value is "substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" (§ 352), the court may exercise its discretion to limit the evidence, or, if the circumstances so justify, exclude it altogether.[11]

[11] We urge the Legislature to examine whether the rule of section 1202 should be amended to exclude criminal defendants seeking to attack their own credibility as declarants. We note that the Comments, which explain the rationale for the rule, do not contemplate the unique situation that arises when the declarant is a criminal defendant. In such a situation, it makes no sense to speak of the danger that the party against whom the hearsay is used might be "deprived of both his right to cross-examine [the declarant] and his right to impeach." A criminal defendant is not deprived of any "right to cross-examine" when he is the declarant,

Even though we conclude that the trial court erred by excluding hearsay evidence of defendant's inconsistent statements on the ground that defendant was required to testify, we find that error harmless. Defendant argues that the trial court's error must be analyzed under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]), because the ruling violated his federal constitutional rights by penalizing his exercise of his privilege against self-incrimination. The Attorney General argues that this involves only an evidentiary issue, to which the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) applies. (Citing *Marshall v. Lonberger* (1983) 459 U.S. 422, 438, fn. 6 [74 L.Ed.2d 646, 103 S.Ct. 843] ["the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules . . ."].) We need not decide which standard applies because the error was harmless under either.

The evidence of defendant's guilt was overwhelming. First and foremost is the recording of his conversations in the jail cell, in which he boasted about shooting Lane and discussed with his coconspirator Thurton whether the police had found, or could find, evidence against them, such as ammunition for the gun that was used. Thurton also told his cellmate, outside defendant's presence, that his "little homey" shot Lane. Moreover, the person who was standing next to Lane when he was shot identified defendant as the shooter, by circling his picture in a photo lineup and by identifying him at trial. Finally, the recording of his inconsistent statements to the police, which was played for the jury after defendant testified, showed defendant's consciousness of guilt, as defendant changed his story each time he was told about evidence the police had found, going from denying he was anywhere near the scene of the shooting, to admitting that he was there but denying he had any knowledge of what was going to happen.

The only difference between what happened at trial and what would have happened had the error not occurred, is that defendant might not have testified. But there were no critical revelations made during that testimony. At most, having defendant testify simply gave the prosecutor an opportunity

and the rule of section 1202 is not necessary to protect his "right to impeach." Obviously, he can cast doubt on the party admissions used against him by taking the stand to testify in contradiction. Moreover, it makes no sense to presuppose, as the Comments do, that "[i]f the hearsay declarant is available, the party electing to use the hearsay [(here, the prosecution)] should have the burden of calling him to explain or deny any alleged inconsistencies." (Comments, *supra*, at p. 27.) The prosecution cannot call the declarant (the defendant), because he is not available to the prosecution. But he is available to the defense, and thus the rule of section 1202 does not remedy some supposed unfairness as between the prosecution (the party using the hearsay) and the defendant (the party against whom the hearsay is used).

to go through in detail defendant's interviews with the police—which was the very evidence defendant sought to introduce under section 1202. In short, we find the error was harmless beyond a reasonable doubt (*Chapman v. California, supra,* 386 U.S. at p. 24), and that even in the absence of error, it is not reasonably probable defendant would have obtained a more favorable verdict (*People v. Watson, supra,* 46 Cal.2d at p. 836).

## DISPOSITION

The judgment is affirmed.

Manella, J., and Suzukawa, J., concurred.

A petition for a rehearing was denied November 18, 2010, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 16, 2011, S188479.