Filed 3/3/16  P. v. Mendoza CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN MENDOZA,<br><br>    Defendant and Appellant. | 2d Crim. No. B249627<br>(Super. Ct. No. BA332081)<br>(Los Angeles County) |

A jury convicted appellant Juan Mendoza of two counts of first degree murder.  (Pen. Code, §§ 187, subd. (a), 189.)[1]  The jury found true special circumstances allegations that he committed multiple murders (§ 190.2, subd. (a)(3)) during the commission of a robbery, burglary, and carjacking (§ 190.2, subds. (a)(17)(A), (G), (L)).  The jury further found true allegations that he used and discharged a firearm (§ 12022.53, subds. (b)-(e)(1)) and committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The trial court sentenced him to two consecutive terms of life in prison without the possibility of parole plus two consecutive terms of twenty-five years to life for the gun use enhancements.  The trial court stayed additional sentence enhancements of 80 years.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

Appellant contends that several errors individually and cumulatively warrant reversal: (1) rulings by the trial court to admit and preclude various statements made by his brother Angel Mendoza (Angel); (2), the lack of an instruction that Angel and codefendant Salvador Viescas were accomplices as a matter of law and that their testimony required corroboration and should be viewed with caution; (3) testimony about the Mexican Mafia; and (4) Viescas's testimony that appellant had been to jail. We affirm.

FACTS

Jesse Gonzalez ran a used car business called Jesse's Auto Sales in East Los Angeles. About two years before the murders, Gonzalez's former son-in-law, Michael Ibarra, washed cars for him for about a month. Ibarra hung out with members of the Lil East Side gang (LES), including Angel. They became upset with him for giving information about them to a rival gang. Angel believed that Ibarra had something to do with the death of his and appellant's brother because Ibarra had laughed when it happened.

Jonathan Van Dyke was a member of the Highland Park gang. He met appellant at an "involuntary residential program" called the Lighthouse Alvarado. The program had a mentoring program in which Van Dyke was appellant's "strength." The day before the murders, appellant and Van Dyke left the program and picked up appellant's truck in Alhambra. They drove to Viescas's house in East Los Angeles. Viescas was a former member of the San Fer gang. He and appellant went into the bedroom and closed the door. They came out after about 10 minutes. Appellant and Van Dyke returned to the Lighthouse Alvarado.

The next day, appellant and Van Dyke again left the program and took appellant's truck to Viescas's house. On the way there, appellant told Van Dyke that a woman had robbed him of some money "and he was going to get it back" by going to the car dealership where her family worked. He was looking for two "punks"—the woman's cousins—who worked there. Van Dyke assumed this meant appellant was going to rob

2

the dealership. Appellant asked Van Dyke what he "wanted out of it." Van Dyke said, "Just a car."

When they got to Viescas's house, appellant told Viescas and Van Dyke "to go look and see who was there" at the dealership. They agreed. Appellant and Van Dyke then left to pick up Angel at a construction site in Glendale so that appellant "wouldn't have to do this alone." The three of them returned to Viescas's house. Appellant told Van Dyke and Viescas to go to the dealership, see who was there, and call them on a "burn" phone, i.e., one with a stolen "chip."

Van Dyke and Viescas walked down an alley to Jesse's Auto Sales, where they saw two of Gonzalez's salesmen, Arturo Saldana and Francisco Cereceres. After two or three minutes, they left through the alley. Viescas called appellant and told him that there were just "two old guys" at the dealership and that he and Van Dyke were on their way back.

Appellant called back and told them, "Hurry up and get your ass back" to the dealership. They ran back. By the time they got there, they saw appellant come out of the office. He had blood on his clothes and hands. He said, "Take my brother and [Viescas], and I'll meet you guys." Appellant was holding three sets of keys and a wallet. Van Dyke took the keys to a Jeep Grand Cherokee that he had seen earlier and liked. He got into the car along with Angel and Viescas. Angel also had blood on his clothes and was holding a small caliber pistol in his lap.

Viescas directed Van Dyke to drive to West Covina. They were running low on gas, so Van Dyke pulled into a gas station. Angel gave him the wallet he was holding. Van Dyke tried to use a credit card from the wallet to get gas but could not figure out the correct zip code to enter. Viescas directed him to a house a few blocks away.

Viescas spoke with a man at the house. Appellant arrived about 45 minutes later in a white Dodge Dakota. He parked in the garage. He told Van Dyke to wipe down the car to get rid of blood and fingerprints. Appellant and Angel removed their clothes and put them in a trash bag.

3

Van Dyke asked appellant what happened at the dealership. Appellant told him, "Don't worry. We got them." When Van Dyke asked who he "got," appellant said, "the dudes that were there." Van Dyke asked him if was "talking about the old guys," appellant said, "Yes. . . . They're not going to be talking to anybody." Van Dyke, believing appellant meant that they had killed Saldana and Cereceres, said, "I'm gone." Van Dyke picked up a checkbook from the dealership that appellant had brought in from the Dakota and drove off in the Jeep. When he got to Highland Park, he tried unsuccessfully to cash one of the checks. He parked the car on a back street at the top of a hill and wiped it down. He then locked the car and threw the keys into a storm drain.

Carlos Jauregui, an LES member, was at home in Montebello on the day of the murders. Angel showed up, and Jauregui drove him to his (Angel's) grandmother's house. Angel told Jauregui that he, appellant, and Viescas had killed Ibarra's father and another person. Later, Angel realized it was not Ibarra's father whom he had killed.

Angel told Jauregui that when appellant picked him up from work, he wanted to borrow his gun because "he was going to go get [Ibarra]." He also wanted to commit a robbery. Angel said that when he and appellant were committing the robbery at the dealership, two men lunged at them. Angel grabbed something used for washing cars and started hitting one of them on the head. He shot both men in the head. Afterwards, he took a car, which he left near a Kmart or Target. He disassembled the gun and threw away the pieces. Later that day while watching a television news story about the murders, Angel told Jauregui he had done that.

When Gonzalez returned to the dealership after his lunch break, he discovered the victims' bodies lying in a pool of blood. A white Dodge Dakota and a Jeep Grand Cherokee were missing from the lot. A checkbook was missing from the office. Saldana's wallet was also missing. Saldana and Cereceres had abrasions all over their bodies. Saldana had two broken ribs. His injuries were consistent with being beaten by a metal hose nozzle. Both died of gunshot wounds.

The gang expert, Detective Eduardo Aguirre, testified that taking money from an LES member's family without paying it back is "a straight-out disrespect" to the

4

gang. Gang members often get money back that they are owed through force and violence. Stolen cars are also of value to gang members for traveling to commit crimes and transporting narcotics by allowing them to avoid detection by law enforcement.

DISCUSSION

*Evidentiary Rulings*

"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)

Appellant contends that in applying the exception to the hearsay rule for statements against penal interest, the trial court erred by admitting and excluding certain out-of-court statements made by Angel. "'"The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." [Citation.]' [Citation & fn. omitted.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 933.) We review the trial court's rulings for abuse of discretion. (*People v. Valdez* (2012) 55 Cal.4th 82, 143.)

*Admission of Angel's Statements to Jauregui*

The prosecution moved to admit Jauregui's testimony that Angel stopped by his home hours after the murders and told him details about how and why they were committed. The trial court admitted this testimony as statements against Angel's penal

5

interest.  Appellant claims that Angel's statement to Jauregui "that appellant had come to him looking for a gun and had instigated the incident" was inadmissible because it "was prohibited blame-shifting and blame-spreading."  We disagree.[2]

It is true that "a hearsay statement 'that is in part inculpatory and in part exculpatory (e.g., one that admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.'"  (*People v. Duarte*, *supra*, 24 Cal.4th at p. 612.)  Section 1230's exception to the hearsay rule "does not apply to collateral assertions within a declaration against penal interest—i.e., any portion of a statement that is not itself specifically disserving to the declarant's interests."  (*People v. Valdez*, *supra*, 55 Cal.4th at p. 144.)  Here, however, "the trial court could have reasonably found that, in context, [Angel's] statement as a whole" regarding appellant coming to him for a gun "was specifically disserving of [Angel's] interest."  (*Ibid.*)

Angel and Jauregui were both members of LES.  The two were "close" and socialized "almost on a daily basis."  Angel lived in Jauregui's garage for more than a month.  Immediately after the murders, Angel came to Jauregui for a ride to his grandmother's house, during which he made the statements at issue.  "[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]  (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.)

Viewed in isolation, Angel's statement that appellant originally came to him and asked to borrow his gun tended to inculpate appellant.  Angel's response:  "No.  No.  I'll go.  I got to do that," however, shifted blame from appellant to Angel, who fired the fatal bullets.  Moreover, appellant's statements to Angel also explained Angel's motive, which was the same as appellant's:  they believed Gonzalez was related to Ibarra, who had "something to do with their brother's death."

---

[2] "We need not resolve . . . the People's forfeiture argument because [this] arguably preserved claim[] fail[s] on [its] merits."  (*People v. Valdez, supra*, 55 Cal.4th at p. 143.)

Taken in context, Angel's statements to Jauregui did not shift the blame for the murders away from himself and onto appellant. Accordingly, the trial court did not abuse its discretion in admitting them.

Appellant also claims that the admission of these statements violated his Sixth Amendment rights. Statements that are not testimonial in nature, such as "a casual remark to an acquaintance," "statements from one prisoner to another," and Angel's statements to Jauregui, "while subject to traditional limitations upon hearsay evidence, [are] not subject to the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821, 824-825.)

*Exclusion of Angel's Statements to the Police*

Appellant moved to introduce statements Angel made to the police that Angel acted alone in going to Jesse's Auto Sales and shooting the victims. He argued that this hearsay evidence also fell into the penal interest exception. The trial court denied the motion because under the totality of the circumstances it could not find that Angel's statement was reliable. Appellant claims that this ruling was an abuse of the trial court's discretion under sections 1230 and 1202 of the Evidence Code and violated his Sixth Amendment right to confrontation.

In determining that Angel's statements that he acted alone were unreliable, the trial court properly considered his fraternal relationship with appellant as a motive to deny appellant's involvement in the robbery and murders. The statements themselves suggest Angel had an ulterior motive. Angel repeatedly told the police that he went to the dealership alone even though these statements were nonresponsive to their questions. The trial court did not abuse its discretion in excluding them under section 1230. As there was no error under state evidence law, appellant's derivative claim under the federal Constitution is also meritless. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1311.)

Appellant also argues that the exclusion of Angel's hearsay statements to the police denied him the opportunity to impeach Angel's inconsistent hearsay statements to Jauregui in violation of section 1202 of the Evidence Code. We need not address this argument, raised for the first time on appeal, because any error was harmless.

7

Angel's version of events was inconsistent with the evidence. In particular, it fails to explain how, acting alone, Angel managed to drive two cars off the dealership lot and park them miles apart. Van Dyke testified that appellant planned to rob the dealership. Appellant himself contradicted Angel's claim to have acted alone in statements he made to both Jauregui and the police. In addition, as we have explained, Angel had a strong motive to lie to the police to protect his brother. Because the evidence contradicting Angel's statement to the police was overwhelming, any error in precluding the jury from hearing it was harmless. (*People v. Baldwin* (2010) 189 Cal.App.4th 991, 1007.)

*Instruction on Accomplice Testimony*

The trial court's jury instructions defined the term "accomplice" (CALJIC No. 3.10) and explained that jurors (1) should view the testimony of an accomplice or codefendant with caution (CALJIC No. 3.18) and (2) could not rely on such testimony to convict absent corroborating evidence (CALJIC Nos. 3.11, 3.12). (See § 1111.) Over appellant's objection,[3] the trial court instructed that Van Dyke was an accomplice as a matter of law. (CALJIC No. 3.16.)

Appellant contends that the trial court erred by not instructing that Angel and Viescas were also accomplices as a matter of law. "Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law. [Citation.]" (*People v. Valdez*, *supra*, 55 Cal.4th at pp. 145-146.)

Viescas maintained his innocence at trial and testified that he did not intend to rob anyone when he went to the dealership. The trial court "properly refused to instruct the jury [he] was an accomplice as a matter of law." (*People v. Manibusan* (2013) 58 Cal.4th 40, 94.) Angel, on the other hand, undisputedly was the shooter who

---

[3] At trial, appellant contended that Van Dyke was not an accomplice as a matter of law and asked the trial court not to give an instruction to that effect because "the inference might be that if he is an accomplice, therefore [everyone] else is."

killed both victims.[4]  The trial court erred in not instructing that he was an accomplice as a matter of law.  (See *People v. Carrasco* (2014) 59 Cal.4th 924, 968 [person "who 'directly commit[s] the act constituting the offense'" is an "accomplice" for purposes of section 1111].)

The error, however, was harmless because the record contains sufficient evidence to corroborate Angel's statements.  (See *People v. Gonzales* (2011) 52 Cal.4th 254, 303.)  After the murders, appellant asked Jauregui if he "had heard what he had done with his brother."  Appellant told him they had gone to look for Ibarra, who "got lucky" because he "had gone to lunch when they got there."  Appellant also told the police that he went to Jesse's Auto Sales on the day of the murders and "[s]omeone gave [him] a set of keys and just told [him] to drive a car away," which he dropped off at the Wal-Mart where it was recovered.  This evidence "is sufficient" to corroborate Angel's statements because "it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth."  (*People v. Fauber* (1992) 2 Cal.4th 792, 834.)

*Mexican Mafia Evidence*

The prosecutor asked the gang expert whether LES members, when they go to prison, "unify with a larger gang within prison or within the jail system."  The expert answered that they do so with the Mexican Mafia prison gang.  Appellant contends that the prosecutor's elicitation of testimony about the Mexican Mafia prison gang was misconduct that, when combined with the trial court's failure to admonish the jury to disregard the testimony, violated his right to due process.

Initially, we reject the People's argument that appellant forfeited a claim of prosecutorial misconduct because he failed to specifically object on that ground.  Appellant made a general objection to the testimony and requested a curative admonition,

---

[4] In arguing that "Angel's guilt was not undisputed," the People cite ambiguous statements in defense counsel's closing argument.  Defense counsel made similar comments during his opening statement while asserting that "Angel Mendoza, for his own reason . . . killed Mr. Saldana and Mr. Cereceres."

which was refused. Requesting the same admonition on the specific basis of prosecutorial misconduct would have been futile. (See *People v. Hill* (1998) 17 Cal.4th 800, 820.)

We reject appellant's contention on the merits. The prosecutor's single question about the Mexican Mafia was relevant to the issues in the case. As the prosecutor pointed out, there had been "testimony about witnesses being intimidated within the jail" and the Mexican Mafia evidence also "explain[ed] why [LES members] would get together with another gang member from Highland Park as opposed to someone that didn't have that gang association." Consequently, there was no misconduct. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 854 [posing questions of questionable relevance not prosecutorial misconduct].)

Nor did the trial court abuse its discretion by denying defense counsel's request for an admonishment to disregard the testimony. The trial court sustained the objection to the testimony and, upon defense counsel's request, informed the jury that the testimony had been stricken. The trial court previously had instructed the jury not to consider evidence that is rejected or stricken. "We must presume the jury heeded the instruction and disregarded the stricken material." (*People v. Horton* (1995) 11 Cal.4th 1068, 1121.)

### *Codefendant's Testimony That Appellant Had Been to Jail*

When Viescas testified in his own defense, he twice suggested appellant may have been in jail. Appellant's trial counsel did not object when either of these two statements were made. Later, during an unrelated sidebar discussion, appellant's trial counsel moved for a mistrial on the ground that Viescas "attempted to volunteer that my client had been in other situations, inviting the jury to speculate my client may have committed other crimes, perhaps serious crimes." The trial court denied the motion because "[t]here was not a timely objection or a request for a curative instruction."

Appellant contends that the trial court erred because the testimony was highly prejudicial to him. We disagree. "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

10

considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 573.) Viescas's two references to appellant's time in jail were brief, irrelevant to the questioning, and expressed with uncertainty ("I believe he got out of—he got out of jail" and "He went to jail or something"). The trial court did not abuse its discretion in ruling they were not prejudicial. (See *People v. Medina* (1995) 11 Cal.4th 694, 751 [no evidence of prejudice where counsel failed to object to unnecessary evidence suggesting defendant previously had been to jail].)

*Cumulative Error*

Appellant asserts that cumulative error compels the reversal of his convictions. We have identified only one error, which was harmless. There is thus no error to cumulate.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

11

Ronald S. Coen, Judge

Superior Court County of Los Angeles

_____

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.