Filed 3/11/13  P. v. Zimmerman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

| | |
|---|---|
| THE PEOPLE, | C066817 |
| Plaintiff and Respondent, | (Super. Ct. No. 09-CR-15841) |
| v. | |
| KENNETH JOHN ZIMMERMAN, | |
| Defendant and Appellant. | |

A jury found defendant Kenneth John Zimmerman not guilty of first degree murder, but guilty of the second degree murder of his neighbor John O'Sullivan. (Pen. Code, § 187, subd. (a).)[1]  The jury also found true allegations that in the commission of the murder defendant intentionally and personally discharged a firearm, namely a .25-caliber Raven Arms handgun, causing great bodily injury and death to O'Sullivan within the meaning of section 12022.53, subdivision (d), and personally used a firearm within the meaning of section 12022.5, subdivision (a).  The jury found

---

[1] Further undesignated statutory references are to the Penal Code.

defendant not guilty of making criminal threats against O'Sullivan's wife, and was unable to reach a unanimous verdict on a charge that defendant falsely imprisoned her. The prosecution dismissed the false imprisonment charge in the furtherance of justice.

The trial court sentenced defendant to an aggregate term of 40 years to life in state prison, consisting of 15 years to life for second degree murder, and a consecutive 25 years to life on the section 12022.53, subdivision (d), enhancement. Defendant's sentence on the section 12022.5, subdivision (a), enhancement was stayed.

Defendant appeals, contending the trial court committed various evidentiary and instructional errors. Having reviewed the record, we shall conclude defendant's contentions lack merit, and that any potential errors were harmless. Accordingly, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY
### I
### The Prosecution's Case

Defendant and O'Sullivan lived on adjacent parcels of land on Jura Lane in rural Amador County. The access road to defendant's residence ran across O'Sullivan's property, which was subject to an easement. Over the years, there were numerous disputes between defendant and O'Sullivan over a gate maintained by O'Sullivan on the access road.

On August 16, 2009, defendant saw a group of people at a pond on O'Sullivan's property near the common gate. Believing O'Sullivan and his family had abandoned the property, defendant confronted the group regarding their presence there. O'Sullivan's wife, who was part of the group, told defendant that the other individuals were her guests and that he had no business yelling at them. Defendant responded that she and her family were going to lose the property and that it would soon be his. He then left.

When O'Sullivan's wife returned home, she told O'Sullivan about her encounter with defendant. Later that evening, after consuming a few beers, O'Sullivan left his

home and drove his Kubota tractor three-quarters of a mile up the access road and onto defendant's property, crashing through defendant's gate in the process. Hearing the commotion, defendant emerged from his home carrying a handgun and watched as O'Sullivan rammed into a woodpile located approximately 81 feet from defendant's front door. According to defendant, defendant asked O'Sullivan what he was doing, and O'Sullivan backed up, punched defendant in the face, and ran over defendant's feet. Defendant fired three shots at O'Sullivan as O'Sullivan was leaving.[2] All three shots struck O'Sullivan. One of the shots entered O'Sullivan's body above his left nipple and passed through his heart. Another shot struck O'Sullivan in the back, perforated his left lung, and stopped near his heart. A third shot entered O'Sullivan's back, and hit both of his lungs, his heart, and his aorta. Any one of the wounds "would have been easily fatal in and of itself."

At 7:42 p.m., defendant telephoned 911 and reported that his neighbor "just blew through my gate with his tractor and tried to run me over" and "destroyed some stuff." He also stated that O'Sullivan "whacked me in the face and broke my glasses." He told the dispatcher, "You better get up here or I'm gonna . . . ." The dispatcher advised defendant, "[W]e're going to get everybody out there, try and stay away from him, where'd he go?" Defendant responded, "I'm going to go after him right now." When the dispatcher again told defendant to stay away from O'Sullivan, defendant said, "Better hurry before I shoot his ass."

At 7:46 p.m., Amador County Sheriff's Deputy Dustin MacCaughey was dispatched to defendant's address where he met Deputy Todd Smith. The dispatcher erroneously advised MacCaughey that defendant stated that he was going to go to O'Sullivan's home and shoot him. As MacCaughey and Smith proceeded up the access

---

[2] Following the shooting, defendant told law enforcement that he fired two shots; at trial, however, he did not dispute the prosecution's evidence that he actually fired three shots.

road off of Jura Lane, MacCaughey saw defendant standing near the rear of a pickup truck, which was blocking the road. MacCaughey immediately handcuffed defendant for "officer safety," then left to look for O'Sullivan, while Smith remained with defendant.

At approximately 8:15 p.m., MacCaughey noticed that a significant portion of a barbed wire fence had been damaged and got out of his patrol car to investigate. He walked through the brush and found O'Sullivan slumped over the controls of his tractor; O'Sullivan was dead. MacCaughey radioed Smith and told him to place defendant in the back of Smith's patrol car and not to talk to defendant.

At approximately 10:45 p.m., Sergeant Brian Middleton with the investigations bureau arrived at the scene and spoke with defendant, who was seated in the backseat of a patrol car. Defendant told Middleton that O'Sullivan crashed through defendant's gate, came in front of defendant's house, and "started destroying shit with his Kubota [tractor]." Defendant ran outside with his pistol, got right next to the tractor, and said, "What the fuck are you doing?" O'Sullivan "whacked" defendant in the side of the head with his left fist and ran over defendant's feet. Defendant fired his pistol and ran inside and telephoned 911. Defendant then telephoned the owner of the property and said, "Get your goddamn lawyer on speed dial, we're going for it." Next, defendant drove his ranch truck to block the access road because O'Sullivan "likes to . . . hit and run." Defendant did not know if he hit O'Sullivan when he fired the shots. When asked if the tractor moved after he fired the shots, defendant responded, "[O'Sullivan] was heading over the cattle guard . . . ." When asked if O'Sullivan was facing defendant when defendant fired the shots, defendant said, "He was going away. [¶] . . . [¶] . . . He was -- he was almost over my cattle guard in front of the house." Defendant explained that "[t]his has been ongoing for the last seven years" and asked "what they gonna do to the asshole." Middleton asked defendant if he had "any idea what started this off tonight," and defendant said that when he returned home around 5:00 p.m., he saw "a bunch of Mexicans fishing" on O'Sullivan's property. O'Sullivan and his wife were "in

4

foreclosure" and the property had been abandoned for two months; thus, defendant wondered, "What the hell is going on here?" Defendant asked the people at the pond, "Hey, who are you?" He also told them, "This is private property." At that point, O'Sullivan's wife began yelling, and defendant said, "Ah, forget it," and went home. Two or three hours later, defendant heard his gate "being crashed."

Middleton took photographs of defendant's feet, hands, and face, and tested defendant's hands for gunshot residue. Middleton observed injuries to the bottoms of defendant's feet and a small mark on defendant's head.

The next day, August 17, 2009, Middleton interviewed defendant at the jail. Defendant's version of events leading up to and following the shooting was basically the same as the one he gave to Middleton at the scene, with a few variations and additions. Defendant stated that after O'Sullivan struck the woodpile, O'Sullivan "backed up, and I went to the side, and that's when he clocked me in the side of the head with his left hand, ran my feet over, and then he started taking off -- well -- with my feet under the tire, and that's when I cut loose two shots." When asked how far away he was from O'Sullivan when he fired the shots, defendant responded 12 to 15 feet. When asked if he could see O'Sullivan's face when he fired the shots, defendant said, "No, cuz he was hauling ass out." When asked where O'Sullivan was going, defendant stated, "He was getting off -- the front of my house, going over the cattle guard, probably going back down Jura Lane." Later, defendant said he "took two shots off when [O'Sullivan] was heading towards the cattle guard." Middleton asked, "But when you shot, he was leaving," and defendant responded, "Yes. [¶] . . . [¶] . . . [A]fter he ran my feet over -- [¶] . . . [¶] . . . -- then he was headed toward the cattle guard right in front of the house . . . ." Middleton also asked defendant where he was aiming when he fired, and defendant said, "Just at him. Just at him." Defendant explained that he had the gun for "home protection," and that he had never fired it before that night. Defendant added, "I figured my life was in danger when the son-of-a-bitch was coming at me with a tractor."

5

On August 17, 2009, Middleton also searched defendant's home and found a pair of eyeglasses. The glasses did not appear to be bent or broken in any manner. Detectives also located the .25-caliber Ravens Arms pistol used by defendant. There were no identifiable finger prints on the weapon, just one unidentifiable print that did not belong to defendant. Detectives also recovered a .25-caliber shell casing in front of defendant's residence. A few months later, in November 2009, a second .25-caliber casing was recovered between the cattle guard and defendant's residence, and in December 2009, a third casing was found near the cattle guard. It was later determined that the casing found near defendant's residence was ejected from defendant's weapon; the two other casings, which were bent and corroded, could not be associated with this case.

Margaret Kaleuati, a senior criminalist with the Los Angeles County Coroner's Office and an expert in gunshot residue, analyzed the gunshot residue test kit administered by Middleton and found no gunshot residue particles on the samples taken from defendant's hands. She explained that the absence of gunshot residue could be caused by defendant wiping his hands on another surface, washing his hands, or by "friction action" from normal activity.

Tire tracks matching O'Sullivan's tractor confirmed that O'Sullivan had driven his tractor past defendant's gate, and up near defendant's residence. O'Sullivan drove over the cattle guard, into defendant's pickup truck, then backed up away from the residence in the direction of the woodpile. O'Sullivan then apparently backed up and proceeded to the cattle guard. The tracks resumed again heading down defendant's drive, in the direction of the damaged fence where MacCaughey located O'Sullivan's body on the tractor. The tractor never came closer than 52 feet from defendant's residence. Damages to defendant's gate and truck were consistent with being struck by the bucket of O'Sullivan's tractor.

Defendant was taken to the hospital prior to being booked into jail. A triage nurse described the wounds to defendant's feet as consistent with "friction burn" and inconsistent with being crushed. The nurse did not see any bruising or lacerations on the tops of defendant's feet and noted that he walked normally, without assistance. Defendant described his pain level as "zero" on a scale of zero to 10, with zero being no pain and 10 being "the worst pain in your life." The nurse treated defendant's injuries by cleaning his feet and applying an antibiotic ointment and a bandage.

An emergency room doctor also examined defendant's feet and observed some bruising and a blister abrasion on the bottom of defendant's left foot, and significant bruising on the bottom of defendant's right foot at the great and second toes. He did not observe any injury to the top of defendant's right foot. The doctor was "underwhelmed" by the injuries to defendant's feet given defendant's claim that his feet had been run over by a tractor but said it was conceivable that the injuries were caused by a tractor running over defendant's feet. The doctor did not observe any limping, and defendant did not complain to him that his feet hurt.

O'Sullivan had a blood alcohol level of 0.159 percent. Decomposition may cause the blood alcohol level to increase; however, the toxicologist who analyzed O'Sullivan's blood sample was unable to determine what percentage of the blood alcohol result was due to the consumption of alcohol and what percentage was due to decomposition.

II
The Defense

Defendant lived on the property on Jura Lane for a number of years. The property was owned by Ted Sakaida. Shortly after O'Sullivan moved onto the adjoining parcel, a dispute arose over O'Sullivan's desire to construct a gate across the access road used by Sakaida to access his property. Sakaida and O'Sullivan discussed ways of preventing O'Sullivan's livestock from leaving the property while still insuring defendant and Sakaida had access to Sakaida's parcel. Sakaida initially prepared to install a cattle

7

guard, however, O'Sullivan would not allow it, telling him, "don't put that thing in there or else." When Sakaida asked O'Sullivan what he meant by "or else," O'Sullivan replied, "You'll find out." Ultimately O'Sullivan installed a gate, which became a constant source of contention.

Deputy Smith testified that he and Deputy MacCaughey were the first law enforcement personnel to arrive at the scene. Smith remained with defendant while MacCaughey went to look for O'Sullivan. In an attempt to assist MacCaughey in locating O'Sullivan, Smith asked defendant, "Where did you shoot, left or right?" Defendant responded, "Inside my gate, another three-quarters of a mile up the road." Smith then asked, "Up which way, to the right or to the left?" Defendant responded, "To the left."

Various friends and family members testified as to defendant's honesty and good nature. While they were aware of defendant's conflicts with O'Sullivan, they never heard defendant threaten O'Sullivan or express any desire to harm him. Other witnesses recounted negative encounters with O'Sullivan, describing his behavior as aggressive and belligerent.

Dr. David Lechuga, a neuropsychologist, testified that defendant had strong visual and spatial acuity, but that he had relatively weak verbally mediated skills. Thus, "his ability to recall things visually is probably going to be better than his ability to describe what he saw or learned verbally." In a stressful situation, such as a shooting, defendant's account of events, even if absolutely truthful, would likely be flawed.

Dr. Craig Lareau, a psychologist, explained that in extremely stressful situations, the body's limbic system responds by releasing hormones and chemicals, the "flight or fight" mechanism, in order to cope and respond to the situation. This reaction dims the higher functioning and reasoning processes so that a person does not slow his or her reaction by over-thinking the situation. Short term memory is shut down, while images and stimuli are stored in longer term memory for later access. Dr. Lareau would not

8

expect a witness to a stressful, life-threatening event to be a good historian of the events while still under the influence of the limbic system response chemicals. He opined that the stress of the encounter with O'Sullivan would account for defendant's failure to mention shooting at O'Sullivan to the 911 dispatcher.

With respect to O'Sullivan's 0.159 percent blood alcohol level, a pathologist testified that while textbooks state that decomposition may increase blood alcohol levels up to 0.05 percent, he had never seen blood alcohol levels increase more that 0.03 percent after extensive decomposition.

An accident reconstruction engineer testified that the spacing of the tire lugs (the portion of the tire that actually touches the ground) was such that a foot could come into contact with the wall of the tire itself, which would cause less damage. He also opined that based on the trajectories, lack of stippling, the gradient of the terrain, and the relative heights of defendant and O'Sullivan, the most likely scenario is that defendant was five feet from O'Sullivan when he shot him.

DISCUSSION

I

Defendant Forfeited His Claim That the Trial Court Erred in Failing to Strike the Testimony of Joe Dirickx Concerning a Firearms Course Taken by Defendant, and in Any Event, Any Error Was Harmless

Defendant contends the trial court erred in failing to strike the testimony of Joe Dirickx who taught a concealed weapon "certification course" attended by defendant in July 2009. Defendant asserts that Dirickx's testimony that the course "included instruction on the asserted duty to retreat," which is contrary to California law, amounted to "conflicting instructions" and "created the likelihood that the jury instructions were subject to erroneous interpretation, in violation of due process." As we shall explain, defendant forfeited his claim by failing to secure a ruling from the trial court on his motion to strike, and in any event, any error was harmless.

9

Dirickx testified in pertinent part that his course included instruction on the use of lethal force and self-defense, and that course attendees are provided with a number of written materials, including a publication from the California Department of Justice, Firearms Division, on handgun safety. When the prosecutor asked Dirickx about one of the documents provided to class attendees, defense counsel asked to approach. Following an unreported bench conference, the trial court admonished the jury as follows: "[I]t's the court's understanding that some of the material that you may see or hear about here involves an issue of law. Please keep in mind that at the end of the trial I will address you on the law and give you the law so that if anything you hear about the law during this proceeding here from any other source other than the court differs from what I give you at the end of the trial, you have to disregard that part you hear here and follow the law as I give it to you."

The prosecutor then showed Dirickx and the jury a page from the California Department of Justice publication on firearm safety and drew their attention to a section entitled, "The Use of Lethal Force in Self-Defense." When asked how that section of the publication is used in his course, Dirickx explained that he "[e]xpand[s] on it" by "instruct[ing] everyone that in a situation their first line of defense, if at all available, is to retreat, to run, that lethal force can only be used when there's no other option open to you and for the protection of life and life only." Defense counsel objected on the ground that Dirickx's testimony was at odds with California law. The trial court sustained the objection and admonished the jury, "[T]his witness is testifying as to what he teaches, and you'll get the law later, as I said before."

Shortly thereafter, the prosecutor sought to question Dirickx about a document entitled, "Five Rules for Concealed Carry," which stated, among other things, "If you can run away . . . RUN!" Another bench conference ensued, during which defense counsel objected to the use of the document on the ground it was inconsistent with California law

10

and could thus mislead the jury. The trial court agreed, and sustained the objection. Thereafter, defense counsel moved to strike Dirickx's entire testimony as irrelevant.

Meanwhile, the prosecutor requested a short recess to determine how to proceed, and the court granted the request. When the prosecutor returned, Dirickx retook the stand, and the prosecutor indicated he had no further questions. Defendant declined to cross-examine Dirickx, and the trial proceeded without the court ruling on defendant's motion to strike.

After the close of evidence, the trial court formally instructed the jury on the law of self-defense, including the following: "A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating."

As a preliminary matter, we agree with the People that it was up to defendant to secure a ruling on his motion to exclude Dirickx's testimony in its entirety, and that by failing to do so, defendant forfeited the issue on appeal. (See *People v. Brewer* (2000) 81 Cal.App.4th 442, 461 ["We follow the long-established rule that where a court, through inadvertence or neglect, neither rules nor reserves its ruling, the party who objected or made the motion must make an effort to have the court actually rule, and that when the point is not pressed and is forgotten the party will be deemed to have waived or abandoned the point and may not raise the issue on appeal"].)

Even assuming for argument's sake that defendant did not forfeit his claim, we find that any error in failing to strike Dirickx's testimony was harmless. In the absence of evidence to the contrary, we presume the jury understood and followed the court's admonition to disregard any material or testimony that conflicted with the law as instructed by the court. (*People v. Burgener* (2003) 29 Cal.4th 833, 870; *People v. Waidla* (2000) 22 Cal.4th 690, 725.) Because nothing in the record suggests the jury did not understand or follow the court's admonition or instructions, we reject defendant's

11

assertion that the jury was confused by the challenged testimony and believed that defendant had a duty to retreat.

## II
## The Trial Court Did Not Err in Failing to Sua Sponte Instruct the Jury on Defense of Property

Defendant next contends the trial court erred in failing to sua sponte instruct the jury in the language of CALCRIM No. 3476, which states that the owner or possessor of real or personal property may use reasonable force to protect that property from imminent harm. We disagree.

It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense if the defendant is relying on it or there is substantial evidence supporting it and it is not inconsistent with the defendant's theory of the case. (*People v. Anderson* (2011) 51 Cal.4th 989, 996-997.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.) Thus, whether the trial court in this case erred in not instructing the jury on defendant's right to defend his property turns on whether defendant was relying on that theory or offered substantial evidence that, if believed by the jury, would raise a reasonable doubt as to whether O'Sullivan's homicide was justified. As we shall explain, defendant was not relying on such a defense, and there is no substantial evidence to support it.

The defense argued defendant's use of force was justified because defendant himself, not his property, was in imminent danger of being hurt or killed. During closing arguments, defendant's trial counsel argued, in pertinent part: "What would your reaction be watching your feet get run over by that little tractor, after you just got hit by your long-time nemesis on your own property? Would you fear for your life? Knowing

12

he could actually use that tractor to go after you some more?  Would you fear for your life?  Would you believe you had every right now to protect yourself?  Of course you would.  There's no doubt about it.  And that's what he did.  And he raised the weapon and he pointed it at Mr. O'Sullivan and he squeezed off what he thought were two shots.  We now know there were three shots.  And then he ran back in his house and he called 911."

As defendant notes, his trial counsel later argued defendant "had every right to prevent *further* acts of destruction to the property."  (Italics added.)  That argument, however, was made in reference to defendant's actions *after* he fired at O'Sullivan.  Defendant's trial counsel was attempting to explain why defendant told the 911 operator, "I'm going to go after him right now," if defendant had already shot O'Sullivan.  In doing so, counsel asserted that defendant "didn't know if John O'Sullivan was alive or injured . . . .  He didn't know where John O'Sullivan was.  He didn't know if John O'Sullivan might make further attempts to vandalize his property. . . .  [¶]  At that point [defendant] had every right to go back out and confront John O'Sullivan . . . .  He had every right to prevent further acts of destruction to the property."  Defendant's trial counsel never argued that defendant fired at O'Sullivan to protect his property from imminent harm.

In addition, the record does not support a finding that defendant used reasonable force against O'Sullivan to protect his property.  Defendant intentionally fired three shots, all of which struck O'Sullivan somewhere in his torso.  No juror reasonably could conclude such force was reasonable under the circumstances.  (See *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360 ["the intentional use of deadly force merely to protect property is never reasonable"].)

In his reply brief, defendant argues for the first time that his conviction for second degree murder leaves open the possibility that the jury may have found that the shots he fired were "warning shots in O'Sullivan's direction, an 'intentional act,' knowingly committed with 'conscious disregard for human life,' whose natural and [probable]

consequences were dangerous to human life." He then appears to suggest that the jury could have found that the firing of warning shots constituted reasonable force in defense of property, had the jury been so instructed. "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal. 4th 952, 1075.) In any event, defendant's argument is absurd. The only evidence is that defendant fired three shots, all of which struck Sullivan in various parts of his torso, and any one of which "would have been easily fatal in and of itself." When asked where he was aiming when he fired the shots, defendant said, "Just at him. Just at him." On this record, no juror reasonably could find that the shots fired by defendant were warning shots.

III

The Trial Court Did Not Err in Allowing an Expert to Testify Concerning the Absence of Gunshot Residue on Defendant's Hands

Defendant next contends that "[t]he trial court erroneously permitted expert opinion testimony that [he] might have deliberately removed gunshot residue in the short interval between his 911 call and the police response" because "there was no evidence of handwashing." Defendant forfeited this claim by failing to object to the admission of the challenged evidence in the trial court, and in any event, this argument is frivolous.

At trial, Kaleuati, an expert in gunshot residue analysis, testified that she examined samples taken from defendant's hands, and there were no particles of gunshot residue found on the samples. The prosecutor then asked Kaleuati whether she would expect to find gun residue on the hands of an individual who had fired a .25-caliber Raven (the type of gun defendant used to shoot O'Sullivan), and defendant's trial counsel objected on the ground the question lacked foundation. The trial court allowed defendant's trial counsel to voir dire Kaleuati, and thereafter, counsel argued that while Kaleuati "may have what I would describe as generalized knowledge based on her experience and the literature, . . . she's got no specific experience with a Raven Arms .25[-caliber] . . . ."

14

The trial court sustained the objection, finding that "although the witness may be qualified in a number of areas, that is not sufficient qualification with respect to experience or education on this particular type of firearm to express an opinion as requested by that last question of the People." Thereafter, the prosecutor asked Kaleuati, "And can you tell us again, assuming that [defendant], in fact, fired *a weapon*, what the reasons would be that you would not find gunshot residue." (Italics added.) Kaleuati answered, without objection, "In general, if you do not find gunshot residue, there are a couple of possibilities. One is that the person may have wiped their hands and removed the gunshot residue onto another surface. The person may have washed their hands and removed the gunshot residue just through friction reaction, friction action. [¶] . . . Or the person may not have discharged a firearm." During cross-examination, Kaleuati confirmed that gunshot residue could be removed during normal activity.

Defendant argues the trial court erred in "permitt[ing] the testimony of [Kaleuati] which indicated that [defendant] may have destroyed evidence by washing his hands or otherwise removing [gunshot residue] from his hands and arms" because there was no foundation for such a conclusion. Defendant contends the error was prejudicial because it contributed to the prosecution's theory that defendant "made up a story and hid or concealed evidence, demonstrating a consciousness of guilt." There are several problems with defendant's argument.

First, defendant forfeited the argument by failing to object in the trial court. He objected when the prosecutor asked Kaleuati if she would expect to find gunshot residue on the hands of someone who fired a .25-caliber Raven, and the objection was sustained. He did not, however, object when the prosecutor subsequently questioned Kaleuati about the reasons she might not find gunshot residue on defendant's hands even though he had fired "a weapon." By failing to object, defendant forfeited the issue on appeal. (*People v. Booker* (2011) 51 Cal.4th 141, 170 [failure to object to the admission of evidence in the trial court forfeits the issue on appeal].)

15

Second, even assuming defendant preserved the issue for appeal, Kaleuati did not conclude that defendant washed his hands, as defendant seems to suggest. Rather, she testified as to the possible reasons why gunshot residue was not found on defendant's hands even though he admitted firing a weapon, including that it may have rubbed off during normal activity.

Finally, contrary to defendant's assertion, the absence of gunshot residue coupled with defendant's admission that he fired three shots provides some evidence from which the jury reasonably could infer that defendant took steps to remove gunshot residue from his hands. While there may be another explanation for the absence of any gunshot residue, there was some evidence to support a finding that he took steps to remove it, as argued by the prosecution. Accordingly, even if the issue was preserved on appeal, the trial court did not err in admitting the challenged testimony.

IV

The Trial Court Did Not Err in Instructing the Jury in the Language of CALCRIM
Nos. 371 or 362, and Any Potential Error Was Harmless

Defendant next contends that the trial court prejudicially erred in instructing the jurors in the language of CALCRIM Nos. 371 and 362, which provides that consciousness of guilt may be inferred from hiding evidence or making false or misleading statements. We disagree and find that any potential error was harmless.

The court instructed the jury in the language of CALCRIM No. 371 as follows: "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

The court similarly instructed the jury in the language of CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that

16

conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." Defendant did not object to either instruction.

"Generally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection. [Citation.] But we may review any instruction which affects the defendant's 'substantial rights,' with or without a trial objection. (Pen. Code, § 1259.) 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Defendant does not contend either instruction was incorrect in law; rather, he asserts that neither was supported by the evidence. He is mistaken.

"When testimony is properly admitted from which an inference of a consciousness of guilt may be drawn, the court has a duty to instruct on the proper method to analyze the testimony." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1104.) Here, there was evidence from which the jury reasonably could conclude that defendant attempted to hide evidence and made false or misleading statements. For example, defendant told the 911 dispatcher and Sergeant Middleton that his glasses were broken during the altercation with O'Sullivan; however, Middleton testified that defendant's glasses were not damaged. Defendant said O'Sullivan ran over his feet with the tractor tires; however, the triage nurse testified the injuries to defendant's feet were inconsistent with being crushed, and the emergency room doctor testified that while it was conceivable defendant's foot had been run over by a tractor, the doctor was "underwhelmed" by the extent of defendant's injuries. No gunshot residue was found on defendant's hands and his finger

prints were not found on the handgun even though he admitted firing the handgun earlier that evening, and two of the three shell casings were missing from the scene. While not critical to the prosecution's case, such evidence was related to the crimes defendant was charged with committing.

Even assuming for argument's sake that the instructions were not supported by the evidence, any error was harmless under any standard. The challenged instructions left it up to the jury to determine whether defendant had tried to hide evidence or made false or misleading statements. The instructions further advised the jury that even if they found that defendant had tried to hide evidence or made false or misleading statements, they could not convict him on that basis alone. The jury also was instructed that some instructions may not apply, and it should not assume that the inclusion of an instruction suggested anything about the facts. Contrary to defendant's assertion, neither instruction lightened the prosecutor's burden of proof, even if erroneously given. (See *People v. Avila* (2009) 46 Cal.4th 680, 709 [addressing lack of prejudice stemming from giving of CALJIC No. 2.06 despite insufficient evidentiary basis therefore]; see also *People v. Williams* (2000) 79 Cal.App.4th 1157, 1166, fn. 8.) Significantly, our Supreme Court has held that "[t]he inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.) The challenged instructions, even if erroneously given, were harmless under any standard.

V

The Trial Court Did Not Abuse Its Discretion in Declining to Admit the Entirety of
Defendant's Conversation with Deputy Smith at the Scene

Defendant next contends the trial court erred in excluding "defense evidence of [defendant's] complete statement to sheriff's deputies who first responded to the crime scene." He argues the statement was admissible as a spontaneous statement (Evid. Code,

18

§ 1240), or alternatively as a prior consistent statement (*id.*, §§ 791, 1236). He is mistaken.

Deputies Smith and MacCaughey were the first to arrive at the scene. Smith had a tape recorder affixed to his duty belt that recorded the events as they happened. Smith remained with defendant while MacCaughey went to find O'Sullivan, and defendant's statements during that time were recorded. In the recording, MacCaughey can be heard telling Smith, "[S]ee if you can get an exact location of where [defendant] shot at [O'Sullivan]." The following colloquy ensued:

"DEPUTY: Where did you shoot, left or right?

"[¶] . . . [¶]

"[DEFENDANT]: Inside my gate, another three-quarters of a mile up the road.

"DEPUTY: Up which way, to the right or to the left? There's two --

"[DEFENDANT]: To the left. To the left."

In addition, defendant can be heard stating that O'Sullivan "blew through the gate and started beating the shit out of some of my property . . . ." Defendant ran outside, "[g]ot next to the tractor and [O'Sullivan] ran over my feet, whacked me in the side of the face," and "broke my other glasses." Defendant "took two shots." He did not know whether he hit O'Sullivan. O'Sullivan was heading towards defendant's gate when defendant shot at him.

At trial, the defense was permitted to play the portion of the recording during which defendant responded to questions concerning defendant's location when he shot at O'Sullivan. The defense also sought to play the entire recording for the jury, asserting that defendant's additional statements to Smith about "what had happened at the residence prior to the shooting" were consistent with statements he later made to Middleton, and thus, were necessary to refute the prosecution's assertion that defendant fabricated the story he told to Middleton later that evening and the following day. Defendant argued his statements to Smith were admissible as spontaneous statements and

19

as prior consistent statements. The prosecution objected on hearsay grounds, arguing the statements "did not fit within the parameters of an excited utterance, as a substantial period of time had passed." Moreover, according to the prosecution, "It is a change in story from the 911 call, which can also show that he had time to think about it." The trial court sustained the prosecution's objection, finding "most of [defendant's] responses, although they certainly exceed the subject matter of the question posed by Deputy Smith, are simply responses to questions and in the court's opinion do not rise to the level of spontaneous statements or utterances."

We review the trial court's ruling for abuse of discretion. (*People v. Ledesma* *(2006)* 39 Cal.4th 641, 708; *People v. Waidla*, *supra*, 22 Cal.4th at p. 725; *People v. Welch* (1972) 8 Cal.3d 106, 117.) None appears here.

To qualify as "spontaneous" under Evidence Code section 1240, a statement must have been made " 'before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance.' " (*People v. Thomas* (2011) 51 Cal.4th 449, 495, quoting *People v. Poggi* (1988) 45 Cal.3d 306, 318.) Here, defendant's statements were not made before he had time to contrive and misrepresent. At least 33 minutes elapsed between the time defendant telephoned 911 and the time he was contacted by Smith and MacCaughey. Accordingly, the trial court did not abuse its discretion in refusing to admit his statements on this ground.

To qualify as a prior consistent statement, a statement previously made by a witness must be "consistent with his testimony *at the hearing* . . . ." (Evid. Code, § 1236, italics added.) "The hearing," as used in the Evidence Code means "the hearing at which a question under this code arises, and not some earlier or later hearing." (Evid. Code, § 145.) Here, the question arose at trial. Defendant, however, did not testify at trial; accordingly, his statements to Deputy Smith at the scene were not admissible as prior

20

consistent statements under Evidence Code section 1236.  (*People v. Hitchings* (1997) 59 Cal.App.4th 915, 921-922.)

Defendant asserts for the first time in his reply brief that his statements were admissible under "Evidence Code [section] 356, which requires that the whole of a statement be introduced once a portion is introduced" and as a prior inconsistent statement under Evidence Code section 1202.  We need not entertain these assertions because they were made for the first time in a reply brief.  (*People v. Tully*, supra, 54 Cal.4th at p. 1075.)  Moreover, neither of these grounds was raised in the trial court, and thus, has been forfeited.[3]  (Evid. Code, § 353.)  In any event, they fail on the merits.

Evidence Code section 356 provides in pertinent part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an *adverse party . . . .*"  (Italics added.)  "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed."  (*People v. Arias* (1996) 13 Cal.4th 92, 156.)  Under Evidence Code section 356, *the prosecution,* as the adverse party, had the right to inquire into "the whole *on the same subject,*" i.e. defendant's location at the time he shot at O'Sullivan.  (Italics added.)  Defendant argues that because the trial court allowed *him* to introduce a portion of the recording, he was entitled to introduce the entire recording.  That is not what Evidence Code section 356 allows.  Accordingly, the entirety of the recording was not admissible under Evidence Code section 356.

---

[3]  To the contrary, in response to the prosecutor's argument that the statements "could not be used under the doctrine of completeness," defendant's trial counsel insisted that he had not "offered them as [Evidence Code, section] 356, but only as spontaneous or prior consistent statements."

21

Evidence Code section 1202 provides in pertinent part: "Evidence of a statement . . . by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." In *People v. Baldwin* (2010) 189 Cal.App.4th 991, cited by defendant, the court found that where the prosecution introduced the defendant's statements in a jail recording as party admissions (Evid. Code, § 1220), "by its plain language, [Evidence Code] section 1202 permitted [the defendant] to introduce his prior inconsistent statements to attack his own credibility as a hearsay declarant in the jail recordings, even though he was able to testify." (*People v. Baldwin, supra,* 189 Cal.App.4th at p. 1003) Here, as in *People v. Baldwin,* defendant's statements to Sergeant Middleton were admissible as statements of a party opponent (Evid. Code, § 1220). As defendant acknowledges, however, unlike that case, his statements to Deputy Smith at the scene were *consistent* with his statements to Sergeant Middleton. Thus, they are not admissible under Evidence Code section 1202. Contrary to defendant's assertion, his statements to Smith are not made admissible because they are inconsistent with the prosecution's *theory* that defendant fabricated his statements to Sergeant Middleton. The statute plainly applies to statements that are "inconsistent with a *statement,*" not an adverse party's theory or interpretation of a statement. (Evid. Code, § 1202, italics added.)

The trial court did not abuse its discretion in not admitting the tape recording of defendant's statements to Deputy Smith in its entirety.

## VI
## Cumulative Error

Finally, defendant contends the cumulative effect of the alleged errors was prejudicial. The premise behind the cumulative error doctrine is that while a number of errors may be harmless taken individually, their cumulative effect requires reversal.

(*People v. Bunyard* (1988) 45 Cal.3d 1189.)  Any of the potential errors identified above "were harmless, whether considered individually or collectively.  Defendant was entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

## DISPOSITION

The judgment is affirmed.


    BLEASE    , J.


We concur:


    RAYE    , P. J.


    ROBIE    , J.