Filed 4/22/15  P. v. Herring CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LYLE HERRING,<br><br>    Defendant and Appellant. | B249468<br><br>(Los Angeles County<br>Super. Ct. No. BA370655) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, William H. Shin and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

## INTRODUCTION

A jury found defendant and appellant Lyle Herring (Herring) guilty of the murder of his wife, Lesley Herring (Lesley), whose body was never found.[1] On appeal, Herring contends that the trial court's erroneous denial of his challenges for cause to three prospective jurors forced him to exhaust his peremptory challenges to excuse them, leaving him unable to challenge a biased juror. He also contends that cadaver dog evidence was improperly admitted and that the jury should have been instructed on voluntary manslaughter. We reject all contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Factual background.

#### A.      *Lesley.*

Lesley was born in March 1964 in Guyana. When she was four, she moved to Maryland. She attended schools in Barbados, Montreal, and Paris. Lesley's family and friends described her as a "creature of habit," a responsible person who paid her bills on time and gave them her itinerary if she was going away. She was "meticulous" and organized, at home and at work.

Lesley married Herring in 1998, and they lived at Lesley's condominium. Lesley's mother, Vivian Telford, was close to the couple. They told her when they argued. One complaint Lesley had was Herring failed to communicate and he constantly started and stopped businesses, which frightened the financially responsible Lesley. Vivian was unaware of any domestic violence, and she believed the couple loved each other.

Lesley, however, sometimes told her mother she didn't love Herring and couldn't see spending the rest of her life with him. Vivian advised it was "dangerous to tell a man that you're going to leave him"; instead, Lesley should " 'just up and leave quietly.' "

---

[1]      Because people involved in the case share surnames, we use first names where necessary to avoid confusion.

Lesley had heard about "The Underground," an organization that helped battered women, although it prohibited a woman from contacting family and friends.

Beginning in 2006 or 2007, Lesley donated $50 every month to a church in Maryland, where her mother lived. With her donations, Lesley enclosed prayer requests. The last check the church received, dated January 1, 2009, was accompanied by a request that the church pray for Lesley because she and Herring were having problems.

As of 2005, Lesley had no major health problems.

B.    *February 2009:  the days leading up to Lesley's disappearance.*

For the past 10 years, Lesley and her mother spoke twice a day during the week. The last time Vivian communicated with her daughter was Thursday, February 5. Lesley was "normal." She did not mention a trip with Herring to Mexico for Valentine's Day.

Lesley went to work on Friday, February 6. Her coworkers noticed nothing unusual about her. Lesley never mentioned a vacation to Mexico. She never obtained the requisite preapproval for any time off to be taken in February. Before leaving work on Friday, Lesley prepared her desk for the upcoming Monday.

On the morning of Saturday, February 7, Vivian spoke to Herring. He told Vivian that he and Lesley argued on Friday night about a dish he'd made that triggered a headache in Lesley, who suffered from migraines. Because of their argument, Herring slept in his car Friday night.[2] Lesley's brother, Linden Telford, spoke to her at about 8:00 a.m. She was her "usual" self.

About noon that Saturday, Ramos Flores repaired a leak in Lesley's condo. Although Lesley was usually friendly with Flores, she wasn't that day; she seemed "[a] bit strange" and "sad." Flores sensed "tension" between Herring and Lesley. Flores did not see Lesley thereafter.

---

[2]    Michael Turallo, a neighbor, saw Herring in the garage Friday night. Herring said he was not having the greatest day.

Late Saturday night or early Sunday morning, Daniel Davidson, who lived in Lesley's complex, took his dog out for a walk.[3]  When they returned, Davidson took the "far elevator," which was not the main elevator.  The elevator stopped at the first floor.  The door opened.  Herring was there with a six feet tall, two feet wide dolly and a "very large rug, not like a tightly wrapped rug."  The rug was between five-to-six feet by 10-to-12 feet.[4]  It was not bound.  Herring looked "aggravated, disheveled," "in a zone," "a little off," and "crazed."

Late Sunday night (February 8) or about midnight (February 9), Turallo saw Herring pushing an empty "refrigerator dolly" to the garage.  Herring said nothing to Turallo, even though they were friendly acquaintances who usually exchanged greetings.

C.    *Lesley disappears.*

On Monday, February 9, 2009, Herring left a voicemail for Vivian, asking if she'd seen Lesley.  Herring also called his cousin, Malcom Thomas, and told Thomas he was tired of his job, he'd been passed over for a promotion, and he was going to "check out."  Afraid that Herring intended to harm himself, Thomas met with Herring.  Herring repeated that he was sick of everything and was done with it.  Whenever Thomas asked about Lesley, Herring said, " 'Don't ask me any questions about Lesley.' "

Lesley failed to show up at work on February 9 and 10, 2009, and she did not call, which was unlike her.  Unable to reach Lesley, her office called her sister, Aasha Pforzheimer on February 10.  Aasha and her mother called Lesley and Herring repeatedly, but neither answered their phones.

The evening of February 10, Aasha and her husband, Jesse Pforzheimer, went to Lesley's condominium, but nobody answered the door.  Lesley's car, a Toyota, was in its parking space, and its hood was cold to the touch.  Aasha and Jesse thought they saw

---

[3]    Davidson estimated the time to be between 12:30 a.m. and 1:00 a.m. Sunday morning, February 8.

[4]    Davidson also said the rug was three to four feet wide.

4

Herring's car, a Mitsubishi Montero, approach the complex, but the car abruptly swerved away.[5]

Aasha and Jesse called the police. Officers conducted a "wellness check" at the condo, but nothing appeared to be unusual.[6] Although Aasha texted Lesley and Herring to tell them the police were at the condo, neither responded.

D.      *Herring's activities after Lesley disappeared.*

While Lesley's family was trying to find her on February 10, Herring met his cousin, Thomas, at approximately 5:30 p.m. Herring's son, Lyle, Jr., also met them. Herring was tense and worried, and he wanted to give some of his things to Thomas and give his Cadillac car to Lyle, Jr.[7] When Thomas said that the items belonged to Lesley if anything happened to Herring, Herring said he didn't want to hear about her. The three men went to the condominium complex at about 7:30 p.m., and Herring gave his Cadillac to his son, who soon thereafter installed subwoofers in the back. Herring got a duffle bag, backpack, and clear plastic bag from his trunk. The plastic bag contained denim jeans, a woman's top, and a pair of women's tennis shoes.

Because he wanted to check on Lesley, Thomas asked Herring if he could go up to the condominium to use the bathroom. Herring refused, saying, " 'Let me think about that for a moment' . . . 'I don't think that will be a good idea.' "

When Thomas and Herring left the complex, Herring slouched down with a jacket over his head, explaining that there were people " 'I do not want to see and have them see me.' " Herring had a gun holster around his ankle, and although there was a "bulge," Thomas did not see a gun.

---

[5]      Thomas testified that he and defendant, in separate cars, were going to the complex when defendant turned left, instead of right, as Thomas expected him to do.

[6]      Officers performed a second wellness check on February 11, but again there was nothing unusual.

[7]      Herring transferred title to the Cadillac and to the Mitsubishi Montero to his son on February 11.

Thomas and Herring went to a restaurant, where Herring said he was going to do something to himself; what he did, he could not come back from. He would burn in "hell" for what he did. Herring said that Lesley's mother would be taken care of and that he planned to change his beneficiaries to his son and Thomas.

Also on the evening of February 10, Herring, who had been having trouble at work, went to his office at Cal State Northridge with Lyle, Jr.[8] and cleaned it out.

On February 11, Herring, using the name "Ralph Mitlanse," checked into the Rodeway Inn in Long Beach and checked out on February 12. On February 12, Herring had his dreadlocks cut off.[9] On February 13 and February 20, he rented a room at the Dunes Inn in Hollywood.

On February 13, Herring was in Mexico, where he saw a realtor about buying a club in Rosarito. Herring told the realtor he had a lot of money, which he would be able to access shortly. Herring never mentioned his wife.

Three days later, February 16, Herring was at a UPS store in San Diego trying to get a will and testament notarized. Herring told the store employee he was going to "take himself out."[10]

On February 19, 2009, Herring was detained at the Mexico border. Herring had changed the license plate on his Mitsubishi Montero. He had a gun holster but no gun; a Valentine's Day card " 'with love for my wife' "; and a will with copies for Lesley, Lyle, Jr., and Vivian.

---

[8] In 2008, Herring received a performance evaluation with which he disagreed. He also received a disciplinary memorandum. Still, the university was not planning to fire him.

[9] The barber who cut Herring's hair testified that Herring returned a week or two later for a touch up and explained that he'd cut off his dreadlocks because he'd been beaten up. It seemed as if Herring was trying to get the barber to remember something Herring had not said on his first visit.

[10] Herring told the responding officer that he was not suicidal.

Herring told the police that he and Lesley had planned a vacation to Mexico. But he had "no idea" where she was. He last saw her on Sunday morning. They'd argued earlier that morning, and she "just got up and left." Lesley "takes off all the time." Herring implied that a reason he went to Mexico was to look for Lesley. But lead investigator Detective Chris Gable retraced Herring's movements in Mexico, and Herring never asked about his wife in Mexico, and he never reported her missing in either Mexico or Los Angeles.

E.    *The investigation into Lesley's disappearance.*

Having not heard from Lesley or Herring, despite repeated attempts to get in touch with them, Aasha filed a missing person's report on February 12, 2009. By February 17, 2009, Lesley's family had still not heard from her or Herring, despite generating publicity by, for example, putting up flyers and a blog. In March 2009, they and the police held a press conference about Lesley's disappearance.[11]

Police searched the condo and Lesley's car on February 13. Spilled wax was on the kitchen counter, notable in part because of Lesley's penchant for neatness. In the master bathroom were towels that were "crinkly" to the touch, which indicated to Detective Gable that they had been used to sop up a lot of water. Inside a bedroom closet was a purse containing jewelry, which, according to Lesley's mother, Lesley never left the house without and which Lesley would never put in her purse. Also in the purse was a Starbucks receipt dated February 9, 2009 at 9:17 p.m., and video surveillance confirmed it was Herring, not Lesley, who was at Starbucks at that time. In the trunk of Lesley's car was her wallet containing, among other things, her driver's license, her cell phone, medical and insurance cards, and house and car keys.

On a nightstand in the bedroom was a letter handwritten by Lesley referring to the struggles she'd been through with Herring. She wrote, "No one should have to live this way, live day to day not knowing if they will have a roof or the other necessities of life. I

---

[11]    The first time Lesley's family saw Herring since Lesley's disappearance was at that press conference.

7

deserve better. I deserve more. What's the point of talking to you? So you can lie? Lie? Lie? I have survived many horrible situation that you have put me through. But each time the experience has left me more damaged. I don't think that I can recover from this last experience. I can't take anymore. I am broken."

A criminalist searched the condo, Lesley's car, Herring's Mitsubishi Montero, and the Cadillac and tested some items but found "nothing of interest."

Analysis of Lesley's and Herring's cell phones showed that, on February 7, the last day that Lesley was seen alive, there was a cluster of activity on her cell phone throughout the early morning, but activity stopped between 8:47 a.m. and 4:30 p.m. At 5:21 p.m., Herring's phone called Lesley's phone. The next activity on Lesley's phone was on February 8, at 8:13 a.m., when her phone called Herring's phone. At 10:57 p.m. on February 8, Herring's phone called Lesley's phone, and both phones accessed the cell tower closest to the condo, indicating that the caller held both phones.

There was no "human directed account activity"[12] on Lesley's credit cards or bank accounts after February 7, 2009, except for five payments made from Herring's account on one of her credit cards. Those last five payments were for the minimum amount due, although the balance had always been paid in full before February 2009. Lesley's savings account contained $26,207.93 at the time of trial.

Analysis of a computer found in Herring's car showed that someone had searched, after Lesley disappeared, for example, " 'suicide by harming oneself' "; "murder+suicide"; travelling to Mexico and Belize; and " 'what country should I flee to?' " Someone also clicked on a link to " 'looking for genuine romance' " and other romance-type links.

Despite extensive efforts, which included alerts to coroner departments, hospitals, local marinas, and the borders, Lesley was never found.

---

[12] Automated payments previously established continued.

8

F.     *Cadaver dog evidence.*

### 1.     David Reaver.

David Reaver, a dog trainer that runs a canine academy, testified as an expert for the People about the training process for dogs. Dogs have an olfactory capacity a million times greater than humans'. Reaver replaces a dog's innate desire to seek, for example, a toy, with a desire to find an odor. When the odor is found, the dog is rewarded with play or a toy. To train cadaver dogs, Reaver uses body parts and "pseudo" odors. His training process begins with a classroom course followed by a patrol class. A basic handler class is six weeks of training. Reaver expects a higher than 90 percent success rate from dogs training to locate human remains.

A "single blind" detection is when the dog's handler does not know where the target odor is located but someone else present during the search does know. A "double blind" detection is where no one present knows if anything is present or where is the target odor or object.

### 2.     Karina Peck and Indiana Bones.

Peck is the human remains canine detection handler for the Los Angeles County Department of Coroner. The department obtained Indiana Bones (Indy), a German Shepherd, in 2005. Peck has been Indy's handler since January 2009. Peck attended "police canine academy to certify" and obtained "state certifications" in January and February 2009. Indy was originally certified in Indiana and she trained at the Coroner's Department with Peck's predecessor. Peck and Indy are annually certified through the state and certified monthly through the police canine academy (Reaver's academy).

Most certification programs are 120 hours, and dogs and handlers certify as a team. During the training process, an instructor places a training aid such as blood or bones or human remains in an area and the dog searches for it. When first training a dog, the handler knows where the training aid is, because the handler wants to understand the dog's behavior when it catches the scent. Eventually, searches are blind, where the team doesn't know where is the training aid. Peck and Indy have trained over 690 hours

together. Indy has located 752 training aids, and has falsely alerted three times. Based on those numbers, her training reliability is 99 percent.

To ensure that Indy does not alert to areas where an odor might be expected to be found (for example, the trunk of a car), Peck routinely puts training aids where it's unlikely for something to be (for example, in a wheel well). To begin a search, Peck has Indy "sit at a heal command" and then commands her, "Such," which means search in Dutch. Indy "alerts" by sitting and pointing with her nose, although sometimes she lies down. When Indy alerts, she is rewarded with a toy.

Peck and Indy have been deployed 110 times and made 64 substantiated finds.[13] Indy's health is "holding up well," and she probably has two-to-three years left to work.

During a search of Lesley's condo and related areas on February 19, 2009, Indy did not alert to anything in the condo; the carport where Lesley parked her car; the space where Herring parked his car; the walkway behind the complex; the elevator closest to the condo; the entrance to the condo; or Herring's storage unit in Burbank.[14] Indy, however, alerted at the base of the garbage trash shoot in the complex, although he did not alert to the trash access point near Lesley's condo.

On February 20, the team went to the tow yard where Herring's Mitsubishi Montero and Lesley's Toyota were being kept, along with one other unrelated vehicle. Detective Gable told Peck to search the Mitsubishi and Toyota, and Peck deployed Indy without specific direction to any vehicle. The doors of the Mitsubishi and Toyota were open, and Indy went to the rear of the Mitsubishi and "alerted to an area of the rear of the vehicle where the floor carpeting meets . . . the plastic trim of the edge of the rear compartment." Items in the trunk were then removed, and Indy "cleared" them. Indy did

---

[13] The team has been deployed in 110 cases, but because they have had multiple assignments in a single case, their total deployment number is 137 with 86 substantiated finds.

[14] Indy also searched the hillside behind the complex but did not alert.

10

not alert to other areas of the vehicle and instead returned to the same spot in the rear of the vehicle. Indy did not alert to Lesley's car or the third car.

The team returned to the tow yard on February 25 to search Herring's Cadillac. Indy alerted to the driver's side floor mat, the floor in the backseat area where some speaker wires were, and the trunk. When the mats were removed, Indy alerted to the driver's side, the rear passenger, and trunk mats. She also alerted to a hole from which speaker wires protruded.

The team searched an area near the merry-go-round in Griffith Park.[15] Indy alerted to two dirt piles that were subject to runoff. The area was excavated but nothing of evidentiary value was found.

## II. Procedural background.

On April 8, 2013, a jury found Herring guilty of second degree murder.[16] (Pen. Code, § 187, subd. (a).)[17] On June 7, 2013, he was sentenced to 15 years to life.

### DISCUSSION

## I. Jury selection.

Herring contends that the trial court's failure to grant his challenges for cause to Prospective Jurors Nos. 7, 13, and 15 forced him to use his peremptory challenges to remove them, leaving him unable to challenge Juror No. 8, an allegedly biased juror.[18] We find that Juror No. 8 was competent to serve as a juror, and therefore Herring's constitutional right to an impartial jury was not violated.

---

[15] Herring had been seen in Griffith Park after Lesley disappeared, and it's common for human remains to be found there.

[16] The jury was not instructed on first degree murder.

[17] All further undesignated statutory references are to the Penal Code.

[18] This issue was raised in a motion for new trial.

11

A.   *Additional facts.*

### 1.      Prospective Juror No. 7.

After telling jurors that they would have to determine whether witnesses were telling the truth and would have to judge each witness by "the same standard," defense counsel asked Prospective Juror No. 7, "What about you . . . ?"  The prospective juror said it "depends," because "[p]eople can lie.  They can put their own opinions.  They can be – depends on circumstances.  They can make up a story.  That's what I believe."  Defense counsel asked the juror if she would "use the same standard to determine whether or not the person is lying whether or not he's a police officer or civilian?"  Prospective Juror No. 7 replied, "Pretty much," but she believed police officers had no reason to lie and she would have a "tendency to go with the police officer."  Although "anybody can tell a lie," "I believe law officers more than individuals.  They can tell a lie or they can make a mistake.  [¶]  But pretty much I believe 80 percent police officers are correct.  That's why we obey what they say.  And their job is helping other people and they keep society right.  So – I – believe them more."

The prospective juror would not use a different standard to judge a police officer versus a civilian witness, "[b]ut for me tendency is I believe, you know, justice system and law officers because no reason they tell a lie.  Especially like murder cases, nobody like accusing somebody unless they have, you know, strong opinion or a strong belief what they have to do. . . . [¶] . . . [¶]  But everybody try to do their job right.  And the police officer, you know, they swore to the society to do a good job.  And why would they lie?  They do not have any personal, you know, anger towards anybody."  The juror agreed she would not know if a witness had a reason to lie, that's "why I say 80 percent, I believe them.  20 percent, they can make a mistake or – I don't know the reason they'd lie.  [¶]  But 80 percent I believe, you know, justice system is doing right thing."

Defense counsel challenged the prospective juror for cause, because the juror "said that she's going to give a police officer's testimony greater weight simply because he's a police officer, and that he has no reason to lie."  The trial court "disallowed" the

12

challenge.  Defense counsel used his first peremptory challenge to excuse the prospective juror.

### 2.       Prospective Juror No. 13.

In 2010, Prospective Juror No. 13's colleague was murdered.  When the trial court asked if the prospective juror could put that aside and "judge the case on the facts of this case," the juror said he would do his best.  The juror acknowledged that "they're two separate instances [this case and the colleague's case].  But I have a personal hold to it.  When he passed away – I have two young daughters.  They were the same age.  [¶]  So I will do my best, but it's hard for me to keep it separate.  I'm just being honest."  When asked if he could be fair, the prospective juror would follow his "heart first," but he would "try to go with my head."

The juror said he could follow the law and vote guilty or not guilty depending on whether the People met its burden of proof.  But when defense counsel asked if the prospective juror "can do it," the juror replied, "I don't think so."

Defense counsel challenged Prospective Juror No. 13 for cause.  The court described the juror as "equivocal.  And my determination of the state of mind of a juror that's equivocal is binding to any court, . . .  [¶]  Based on the totality of his answers, I find that he will be fair and impartial."  The defense used one of its peremptory challenges to this juror.

### 3.       Prospective Juror No. 15.

Prospective Juror No. 15 said she was "emotional, I'm very sensitive person.  Sometimes I can watch the TV; I can cry.  I don't want to have a wrong judgment.  I want tell you I'm very sensitive, emotional.  I don't know about it."  She wanted to "let God . . . do this judgment.  I cannot do my own judgment . . . .  [¶]  I understand it's not easy case.  I can do this, you know, judge in this case and I want to be honest.  You know, I am very emotional person.  I cannot do judgments."  When defense counsel asked if the prospective juror could listen to the evidence and judge the case based on the evidence, she replied, "I'm sorry.  When is a murder, I can't do that."

13

The trial court denied the defense challenge for cause, saying, "she is emotional; she doesn't want to be here. But there's nothing that says she can't be fair." The defense used a peremptory challenge to remove this prospective juror from the panel.

#### 4.        Prospective Juror No. 17/Juror No. 8:

Juror No. 8 originally was Prospective Juror No. 17. He had read about the case two years ago on Nancy Grace. He "kind of thought: Okay. Probably like similar to how the case in the past, like with O.J. Simpson case or even – or even the Robert Blake case, it's probably some problems in the marriage that might have caused him to do – to do that." Although the juror had formed an opinion, he said he could be fair. When defense counsel asked a second time if the juror could be fair, the juror said, "when you see something or you experience something, it's automatically that person has that bias in their memory bank. Right? [¶] Like once you read an article or read news, that memory is in your – it's in your mind, versus someone who did not read the news or didn't experience it, their opinion is completely unbias[ed]. [¶] So I cannot say, . . ."

The trial court asked if the juror could "set aside what you learned and decide this case solely on the evidence that comes from the witness stand and the law that I give you?" Juror No. 8 answered, "Right. Yeah. I try to set aside. [¶] You know, the fact that I read the article and, you know, if that's going to be bias, then I will try to set it aside." On being questioned further by defense counsel about the juror's use of the word "try," Juror No. 8 said, "I mean, like honestly, it's either – it's either a hundred percent 'yes' or 'no.' Right? There's no, like, gray area?"

This exchange then occurred:

"[Defense counsel]:  . . . [Y]ou know if you can do it or not. Can you do it? I mean, you say, 'I'm going to try.' Does that mean you're going to do it?

"[Juror No. 8]: Right. Do it without – without being biased?

"[Defense counsel]: Right.

"[Juror No. 8]: Without being biased. [¶] Yeah. To be honest, most likely not because of the previous stories that I read, you know, regarding this case and also the O.J.

14

Simpson and Robert Blake case. It's affecting – affects you, your judgment or your viewpoints, right, on the case in general."

Although Prospective Juror No. 17/Juror No. 8 was on the voir dire panel, defense counsel passed for cause. The People accepted the panel, and the parties, including the defense, proceeded with peremptory challenges. Not until Prospective Juror No. 17 became Juror No. 8, did defense counsel ask to challenge him for cause. The court said it was too late. When defense counsel asked if the court would accept a stipulation (even though the prosecution had not offered one), the court said it would not. The panel was sworn in.

Thereafter, counsel argued that challenges for cause can be made at any time before the panel is sworn. The trial court repeated that the challenge had to be timely, and noted that the defense had passed for cause. Counsel explained he'd passed for cause due to "inadvertence." The court responded, "Counsel, I've known you too well. You are not incompetent. I don't accept inadvertence. [¶] I mean, I appreciate you trying to fall on your sword, but that's not – that's not you. You're not that type of lawyer."

B. *Herring's constitutional right to an impartial jury was not violated.*

To help ensure a criminal defendant's constitutional right to trial by an unbiased, impartial jury (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16), a juror may be challenged for cause for implied or actual bias. (Code Civ. Proc., § 225, subd. (b)(1); *People v. Black* (2014) 58 Cal.4th 912, 916.) Implied bias is "when the existence of the facts as ascertained, in judgment of law disqualifies the juror." (Code Civ. Proc., § 225, subd. (b)(1)(B); see also *Black,* at p. 916.) " ' "Actual bias" [is] the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." [Citations.]' " (*People v. Ayala* (2000) 24 Cal.4th 243, 271-272; see also Code Civ. Proc., § 225, subd. (b)(1)(C).)

" ' "Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in

the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]" ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1285; see also *People v. Boyette* (2002) 29 Cal.4th 381, 416; *Wainwright v. Witt* (1985) 469 U.S. 412, 424, 428.)

When a court erroneously denies a challenge for cause, the defendant must show that the error effected his or her right to a fair trial and impartial jury. (*People v. Black, supra,* 58 Cal.4th at p. 920.) "When a defendant uses peremptory challenges to excuse prospective jurors who should have been removed for cause, a defendant's right to an impartial jury is affected only when he exhausts his peremptory challenges and an incompetent juror, meaning a juror who should have been removed for cause, sits on the jury that decides the case." (*Ibid.*, citing with approval *People v. Yeoman* (2003) 31 Cal.4th 93, 114.)

Thus, under *Black* and *Yeoman*, the issue is whether an incompetent juror—Juror No. 8—was forced on Herring, not whether Herring's challenges for cause to Prospective Jurors Nos. 7, 13, and 15 were erroneously denied. (*People v. Yeoman, supra,* 31 Cal.4th at p. 114.) In other words, "the only for-cause challenges that are relevant on appeal are challenges made to *sitting* jurors. That is, even if the trial court erroneously denied for-cause challenges to *prospective* jurors who were later excused by peremptory challenges, the defendant cannot show that his right to an impartial jury was affected by the denial of the for-cause challenges, unless the trial court erroneously denied a challenge for cause to a sitting juror." (*People v. Baldwin* (2010) 189 Cal.App.4th 991, 1000-1001; see also *Yeoman*, at p. 114 [defendant could not show his right to an impartial jury was affected because he did not challenge for cause any sitting juror; hence, "[n]o incompetent juror was forced upon him"].)

Herring cannot establish prejudice from Juror No. 8 sitting on his jury. To the extent *Yeoman* and *Black* require a defendant to challenge for cause the allegedly biased

16

sitting juror, Herring failed to meet that requirement. When Juror No. 8 was on the voir dire panel, defense counsel passed for cause. The parties then used their peremptory challenges to remove other prospective jurors. Not until Prospective Juror No. 17 became Juror No. 8, did defense counsel try to challenge Juror No. 8 for cause. But the trial court denied the request as untimely.

The trial court was correct. "All challenges for cause shall be exercised before any peremptory challenges may be exercised." (Code Civ. Proc., § 226, subd. (c); see also *People v. Black, supra,* 58 Cal.4th at p. 916 ["criminal defendants are allowed an unlimited number of challenges to prospective jurors for cause, which the defendants must use before exercising any peremptory challenges"].)

Herring, however, argues that the trial court could have entertained the challenge for cause, even though the parties had passed for cause and exercised their peremptory challenges. (See, e.g., Code Civ. Proc., §§ 226, subd. (a) ["A challenge to an individual juror may only be made before the jury is sworn"], 231, subd. (e) ["If all the parties on both sides pass consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order"].)[19] That the trial court may have had the authority to consider the untimely challenge for cause to Juror No. 8 does not mean that the court abused its authority by refusing to do so. Rather, the court expressly found that defense counsel's failure to challenge the juror in a timely manner was not due to "inadvertence."

Moreover, allowing a party to exercise challenges for cause *after* peremptory challenges undercuts the process of jury selection. Under California's "jury box method," "12 prospective jurors are questioned, subjected to challenges for cause, and replaced until 12 qualified jurors remain. Both sides then exercise peremptory challenges." (*People v. Avila* (2006) 38 Cal.4th 491, 537.) Parties therefore use their limited supply of peremptory challenges to *qualified* jurors, the unqualified jurors having been removed by the unlimited challenges for cause. (See *ibid.*) This system thus

---

[19] Herring also relies on *Silcox v. Lang* (1889) 78 Cal. 118, 120-121, 123-124, which concerns use of a *peremptory* challenge. It is not on point.

benefits all parties, including defendants, because they do not have to use their scarce peremptory challenges to remove biased jurors.

Even if we assumed that the challenge for cause was timely, Juror No. 8 was not, as a matter of law, incompetent to sit on the jury. A "qualified" juror is not necessarily one who is "totally ignorant of the facts and issues involved." (*Murphy v. Florida* (1975) 421 U.S. 794, 799-800.) There is a distinction between a mere familiarity with the defendant and an actual predisposition against him. (*Id.* at p. 800, fn. 4.) Juror No. 8's passing familiarity with the case did not reveal a bias against Herring. Rather, when asked if the juror could decide the case based on the evidence and the law presented at trial, the juror said he could. (See, e.g., *People v. Pride* (1992) 3 Cal.4th 195, 228-229 [challenges for cause to jurors who had read about the case and formed opinions about defendant but said they could be fair were properly denied].) Juror No. 8's references to a "gray area" and that what one reads "affects" "judgment or your viewpoints" were thoughtful, but ultimately unremarkable, observations that he could not unlearn what he had learned about the case, that jurors bring with them their life experiences. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1414 [jurors are " 'fully functioning human beings, bringing diverse backgrounds and experiences to the matter before them' "].) These statements fail to show that Juror No. 8 was biased against Herring.

Because we conclude that Herring was not prejudiced by the presence of Juror No. 8 on the jury, we reject Herring's alternative contention that his counsel provided ineffective assistance of counsel by failing to challenge for cause the juror in a timely fashion. (See generally *Strickland v. Washington* (1984) 466 U.S. 668 [a defendant claiming ineffective assistance of counsel must establish both error and prejudice].)

18

## II.    Admissibility of the cadaver dog evidence.

Before trial, Herring moved to exclude the cadaver dog evidence on the grounds it lacked foundation and corroboration and under Evidence Code section 352.[20] We reject Herring's contention on appeal that the trial court erred in admitting the evidence.

*People v. Malgren* (1983) 139 Cal.App.3d 234 (*Malgren*),[21] which involved a police dog tracking a burglary suspect from the burgled home over a trail of about seven-tenths of a mile, sets forth the foundational requirements for admitting dog-tracking evidence.[22] "[T]he following must be shown before dog trailing evidence is admissible: (1) the dog's handler was qualified by training and experience to use the dog; (2) the dog was adequately trained in tracking humans; (3) the dog has been found to be reliable in tracking humans; (4) the dog was placed on the track where circumstances indicated the guilty party to have been; and (5) the trail had not become stale or contaminated." (*Id*. at p. 238; see also *People v. Craig* (1978) 86 Cal.App.3d 905.)

As an initial matter, we reject Herring's suggestion that the trial court never considered the issue of foundation under *Malgren*. Foundation was raised in Herring's motion in limine and at the hearing on the motion, although it was not discussed in depth. The court stated it had read the motion and the People's opposition, and the court referred to the foundation issue: "As far as foundational requirements that counsel mentioned, in [*People v. Gonzales* (1990) 218 Cal.App.3d 403] it held that a conviction of a crime may not be had where dogs – and that was dealing with dog tracking evidence, I hold the same relating to cadaver dog evidence – is used unless there is some other corroborative evidence. However, the corroborative evidence need not be evidence, which standing

---

[20]    Herring also argued that the evidence was inadmissible under *Kelly-Frye* but does not raise that issue on appeal.

[21]    *Malgren* was disapproved on another ground in *People v. Jones* (1991) 53 Cal.3d 1115, 1145-1146.)

[22]    Herring does not dispute that the *Malgren* factors apply to this case, although it involves a cadaver dog as opposed to a tracking or trailing dog.

alone independently, links the defendant to the crime. Corroborative evidence need only support the accuracy of the dog evidence and the identification implied by it. [¶] Again, this is premature. Since *Kelly* has been met, the cadaver dog evidence is admissible. Whether there is sufficient corroboration or not would go to an 1118.1 motion." (Italics added.)

Based on this record, it is true that the trial court did not discuss each *Malgren* factor. But the court clearly considered those factors, because the court had read the parties' papers, which discussed *Malgren*. But even if we assumed that the court should have, for example, gone through each of the factors, any error was harmless. As we now discuss, there was a sufficient foundation to admit the cadaver dog evidence, under *Malgren.*

First, Herring attacks Peck's qualifications because she was certified in January and February 2009, a mere week or so before conducting the searches for Lesley's body, and Peck and Indy had done only two searches together prior to the search for Lesley.[23] The crucial point, however, is that Peck was certified, having done 40 hours of handler development training, which included how to "interpret as a dog handler," and 120 hours of a detection course to obtain that certification. Before attending those certification courses, a senior K-9 handler taught Peck the "basics." Peck was also familiar with Indy before becoming her official handler, because Peck had worked in the coroner's department since 2005. Reaver, who trains police dogs, also testified that dogs adapt to new handlers.

Second, Herring argues that Indy was inadequately trained because she had "obedience" problems. Peck, however, explained that Indy's problem was a tendency to protect her handler too much, but the issue was resolved through additional training. Peck also testified to the extensive training she conducts with Indy, which includes searches for residual blood, tissue, bone, and bodies. They have trained over 690 hours together. Indy has located 752 training aids, and falsely alerted three times. Peck and

---

[23]     Peck testified at the preliminary hearing and at trial.

20

Indy are annually certified through the state and certified monthly. Reaver also testified extensively about the training process dogs like Indy go through.

As further "proof" Indy was unreliable, Herring points out that Indy alerted to the dirt piles at Griffith Park, even though no body was found. But Peck explained that the dirt piles were subject to "runoff" from other areas, and that runoff might contain an odor Indy is trained to alert to. Reaver similarly testified that rain runoff can cause scent to "migrate."

Third, Herring faults the "identification procedure," because it was not "double-blind" to prevent "cuing," which is a conscious or unconscious hint to the dog it should find something. Although Peck was told which cars were of interest, she deployed Indy without specific direction to any vehicle. This is in accord with *Malgren*'s directive there be evidence the dog was placed on "the track where circumstances indicated the guilty party to have been." (*Malgren, supra,* 139 Cal.App.3d at p. 238.) There was evidence Lesley's body may have been in one or more of Herring's cars: on the night Lesley disappeared, witnesses saw Herring pushing a dolly and a large rug to the garage. Insofar as the job cadaver dogs do is analogous to what tracking dogs do, the foundational element was therefore satisfied.[24]

Herring attacks the final *Malgren* factor—staleness of the alleged crime scene or contamination—because the cars had been in use between Lesley's disappearance on February 7 and the searches of the cars on February 20 and 25. Between the time Lesley disappeared and the searches, Herring, for example, drove the Mitsubishi Montero to Mexico, and he gave the Cadillac to his son, who installed speakers in it. Peck, however, testified at the preliminary hearing that odors are "retained": "if say a blood swatch or an entire decedent was completely contained and not touching directly, the fact that it was

---

[24] The defense expert, Dr. Lawrence Myers, certainly cast doubt on the reliability of Indy's alerts. He testified that because Peck and officers present at the search knew which were the suspect vehicles, they could have consciously or unconsciously influenced Indy to produce an expected outcome. The jury could consider that testimony in evaluating the evidence, but the testimony does not render the evidence lacking in foundation.

placed in a vehicle, the scent emanating from that would be collected in that vehicle and as it remains closed especially that odor will permeate . . . [and] be retained . . . ." A scent dog can even pick up odors from areas that have been bleached or washed. Reaver, also testified that dogs detect "residual odors" where an item once was. During an experiment, for example, a dog alerted to the pocket of a shirt where a marijuana cigarette had been removed, even though the shirt had been washed.

In addition to the foundation argument, Herring alternatively argues, under Evidence Code section 352, that the "evidence was not relevant because it lacked a sufficient basis establishing its reliability." To the extent this argument repeats the ones above, we reject it.

To the extent Herring's argument is the evidence lacked probative value because it was "uncorroborated" by, for example, physical evidence, the argument is meritless. Relevant evidence may be excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See also *People v. Lee* (2011) 51 Cal.4th 620, 643; *People v. Waidla* (2000) 22 Cal.4th 690, 724.) We apply the abuse of discretion standard to a trial court's rulings on the admissibility of evidence, including those turning on the probative value of the evidence in question. (*Lee,* at p. 643; *People v. Hamilton* (2009) 45 Cal.4th 863, 930.)

Herring cites several out of state authorities involving cadaver dog evidence, including *Trejos v. State* (Tex.App. 2007) 243 S.W.3d 30. In that case two cadaver dogs, independently of each other, alerted to the spot where the defendant said he'd buried a body. (*Id.* at p. 38.) No body was found. In finding that the probative value of the evidence substantially outweighed the danger of unfair prejudice, confusion of issues or misleading the jury, the court said that the dogs' alerts merely corroborated the defendant's incriminating statements. (*Id.* at p. 55.)

Here, other evidence that Lesley was dead corroborated the cadaver dog evidence. Lesley was last seen alive on February 7; she had not contacted family or friends since

22

February 7; she had not accessed her credit cards or savings account; she left her belongings behind; Herring made incriminating statements that he would go to "hell" for what he did; and Herring engaged in incriminating behavior (e.g., going to Mexico, threatening suicide, and changing his hairstyle).

We also do not agree that the evidence should have been excluded because there was a risk the jury would accord it too much weight. As we have pointed out, there was an abundance of other compelling evidence that Lesley was dead. The jury was also instructed with CALJIC No. 2.16, which told the jury how to view the cadaver dog evidence. And, as we next discuss, that instruction was proper.

### III.    The jury instruction on the cadaver dog evidence.

With respect to the cadaver dog evidence, the trial court gave a modified version of CALJIC No. 2.16. Although it does not appear on this record that the defense objected to the instruction, Herring now contends that the court erred in giving it.[25] We disagree.

The trial court gave this modified version of CALJIC No. 2.16: "Evidence of canine human remains detection has been received for the purpose of showing, if it does, that the crime of murder has been committed and that the defendant is the perpetrator. This evidence is not by itself sufficient to permit an inference that the defendant is guilty of the crime of murder. [¶] *Before guilt may be inferred there must be other evidence that connects the defendant with the commission of the offense. The corroborating evidence must be evidence, which independently, links the defendant to the crime.*

---

**25**    It appears that there was an off the record discussion about jury instructions after which the court asked the parties if they had any objections to the "court's proffered instructions[?]" The written instruction form states it was given on the court's motion. No objections, including one to CALJIC No. 2.16, were made. This is problematic, because we cannot ascertain if, for example, defense counsel asked for the modifications to the instruction, in which case the doctrine of invited error might apply. (See generally *People v. Lucero* (2000) 23 Cal.4th 692, 723-724 ["The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction"].) We will, nonetheless, address the issue on the merits, notwithstanding this and possible forfeiture problems.

23

However, this evidence may be circumstantial. [¶] In determining the weight to give to canine human remains detection evidence, you should consider the training, proficiency, experience, and proven ability, if any, of the dog[,] its training, and its handler, together with all the circumstances surrounding the canine human remains detection in question." (Italics added.)

In contrast, the unmodified version of CALJIC No. 2.16 provides, in relevant part: "Before guilt may be inferred, there must be other evidence that supports the accuracy of the identification of the defendant as the perpetrator of the crime. [¶] The corroborating evidence need not be evidence which independently links the defendant to the crime. It is sufficient if it supports the accuracy of the dog tracking." Herring thus complains that the trial court's modified instruction eliminated a requirement that independent evidence corroborate the accuracy of the dog scent evidence.

This notion of corroboration derives from *Malgren*. *Malgren* first found that, in light of the "stringent foundational requirements which must be met" before dog scent evidence is admissible at all, "we see no reason to categorize that evidence thereafter as inferior or untrustworthy, and instruct that it be given *less* weight than other evidence." (*Malgren, supra,* 139 Cal.App.3d at p. 241.) *Malgren* then held that the trial court should have instructed that "(1) when dog tracking evidence is used to prove the identity of a defendant, there must be some other evidence, either direct or circumstantial, which supports the accuracy of that identification evidence; and (2) in determining what weight to give such evidence, the jury should consider the training, proficiency, experience, and proven ability, if any, of the dog, its trainer, and its handler, together with all the circumstances surrounding the trailing in question." (*Id.* at p. 242.)

Thereafter, *People v. Gonzales*, *supra*, 218 Cal.App.3d at page 408, agreed that a jury must "find other circumstances which support[] the accuracy of the dog-tracking evidence." In reaching that conclusion, *Gonzales* rejected an argument that the corroborating evidence must independently link defendant to the crime. Such an argument "misjudges the reservations expressed by courts about this type of evidence. The concern is not trustworthiness for that is addressed in the threshold decision to admit

24

the evidence. Rather, the concern is that there be other circumstances supporting the accuracy of the inferences drawn from the dog-tracking evidence." (*Id.* at pp. 413-414.) *Gonzales* therefore rejected a higher standard of corroboration (i.e., one that independently links the defendant to the crime) in favor of a lower standard (i.e., one that "merely supports the accuracy of the dog tracking"). (*Id.* at p. 408.)

The trial court here imposed a higher standard of corroboration than *Gonzales* requires. This makes sense under the circumstances, where the main point of the dog scent evidence was to confirm that Lesley was dead, not to identify Herring. This contrasts with the dogs in *Malgren* and *Gonzales*, who tracked burglary suspects; hence, the defendants' identity was the point of the dog scent evidence. Where, as here, the jury could have equated evidence that Indy alerted to the smell of a dead body with Herring's identity as Lesley's killer, the court was right to instruct that the jury had to have *independent* evidence linking Herring to the crime. We therefore fail to see how Herring was prejudiced by the court's imposition of a more stringent burden of proof on the prosecution.

But, to the extent Herring nonetheless maintains that CALJIC No. 2.16 should have contained language requiring evidence corroborating the *accuracy* of Indy's alerts, we still discern no prejudice, whether the issue is reviewed under *Chapman v. California* (1967) 386 U.S. 18, 24, or *People v. Watson* (1956) 46 Cal.2d 818. The accuracy of the dog scent evidence was corroborated. Lesley was last seen at her condominium on Saturday afternoon. A neighbor saw Herring, behaving strangely, pushing a large dolly and rug big enough to conceal a body at about midnight Sunday morning. Later Sunday night, another neighbor saw Herring pushing a large dolly to the garage. That Lesley was dead was also corroborated by evidence, for example, she has not been seen or heard from since February 7; she has not used her credit cards or accessed her accounts; and

Herring contemplated suicide, saying he would go to hell for what he had done.  Any instructional error was therefore harmless.[26]

## IV.    Instruction on voluntary manslaughter.

Herring contends that the trial court violated his constitutional rights when it denied his request for instruction on voluntary manslaughter, heat of passion.[27]  We disagree.

A trial court must instruct the jury, sua sponte, on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.  (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  This duty includes a duty to instruct on lesser included offenses.  (*Moye*, at p. 548; *Breverman,* at p. 154; *People v. Souza* (2012) 54 Cal.4th 90, 114.)  " ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." [Citations.]' " (*People v. Enraca* (2012) 53 Cal.4th 735, 758; see also *People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Manriquez* (2005) 37 Cal.4th 547, 584.)  We independently review the trial court's failure to instruct on a lesser included offense.  (*Manriquez*, at p. 587.)

Voluntary manslaughter is a lesser included offense of murder.  (*People v. Breverman, supra*, 19 Cal.4th at p. 154; *People v. Thomas, supra,* 53 Cal.4th at p. 813.)  Voluntary manslaughter under a heat of passion theory "arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent

---

[26]    Because we find no error in either the admission of the dog scent evidence or in the instruction on that evidence, we reject Herring's cumulative error argument.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

[27]    Defense counsel suggested that Lesley's brother's testimony that he thought Herring hit Lesley and killed her after an argument supported the instruction.  The trial court correctly called that evidence "supposition."  The failure to instruct on voluntary manslaughter was also raised in Herring's motion for a new trial, which was denied.

as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201; see also *People v. Beltran* (2013) 56 Cal.4th 935, 942.)  The provocation that incites the defendant to homicidal conduct must be caused by the victim or be conduct the defendant reasonably believed to have been engaged in by the victim.  (*People v. Manriquez, supra*, 37 Cal.4th at p. 583; *People v. Lasko* (2000) 23 Cal.4th 101, 108; *People v. Lee* (1999) 20 Cal.4th 47, 59.)  No specific type of provocation is required, and the passion aroused need not be anger or rage but can be any violent, intense, high-wrought or enthusiastic emotion other than revenge.  (*Lasko*, at p. 108; *Beltran,* at p. 950.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component.  [Citation.]  The defendant must actually, subjectively, kill under the heat of passion.  [Citation.]  But the circumstances giving rise to the heat of passion are also viewed objectively. . . .  '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.)

To support his argument he killed Lesley in a heat of passion, Herring cites evidence that although he and Lesley generally had a good relationship, they had begun to have problems.  Lesley told her mother she thought about leaving Herring.  Lesley asked a church to pray for her and Herring, and Lesley wrote a note to Herring expressing her unhappiness.  A fight between Lesley and Herring the night before she disappeared caused Herring to spend Friday night in his car.  And Flores, the condo's maintenance supervisor, noticed "tension" between the couple the day Lesley disappeared.

The existence of marital problems without more, however, will not support a voluntary manslaughter instruction.  (*People v. Marshall* (1996) 13 Cal.4th 799, 848 [evidence that defendant's wife/victim said, " 'Why, George?' " shortly before the

27

defendant shot her and that defendant was concerned his wife was planning to leave him did not warrant a heat of passion instruction].) In *People v. Cole, supra,* 33 Cal.4th 1158, for example, evidence that the defendant was intoxicated and jealous and his statement he went "berserk" after his wife/victim said she would put a " 'butcher knife in your ass' " might satisfy "the *subjective* element of heat of passion." (*Id*. at p. 1216.) But it "did not satisfy the objective, reasonable person requirement, which requires sufficient provocation by the victim. (*Ibid.*) Rather, that the defendant and his wife had longstanding marital problems characterized by "bickering, yelling, and cursing" established that their abusive conduct the night the victim was killed was "no different" than prior occasions when they argued. (*Ibid.*; see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 826-827 [evidence that the victim "cussed" at the defendant and assaulted him was insufficient to rise to the level of provocation necessary to support voluntary manslaughter instruction].)

There is even less evidence here than in *Marshall* and *Cole* to support voluntary manslaughter. At most, Lesley and Herring were having marital problems and "tension" existed between them on Saturday afternoon, just before Lesley was last seen. What happened thereafter is unknown. There is no evidence that the couple argued or that Lesley said or did something that provoked Herring. There is no evidence of Herring's response to any provocation. That Herring killed while in a heat of passion is nothing more than speculation. Speculation is not substantial evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1200 [trial court need not give instructions based solely on conjecture and speculation]; see *People v. Lee, supra,* 20 Cal.4th at p. 60 [adequate provocation and heat of passion must be affirmatively demonstrated].)

Herring nonetheless makes a related claim of instructional error: the trial court's instructions on murder were inadequate because they did not include as an element of murder the "absence of provocation."[28] The prosecution, however, does not have the

---

[28]     The jury was instructed on murder (CALJIC No. 8.10) and malice (CALJIC No. 8.11).

burden of proving an "absence of provocation" where heat of passion and provocation were not at issue. (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 643.) "Thus, in California, when a defendant puts provocation in issue by some showing that is sufficient to raise a reasonable doubt whether a murder was committed, it is incumbent on the prosecution to prove malice beyond a reasonable doubt by proving that sufficient provocation was lacking." (*Ibid.* see also *People v. Rios* (2000) 23 Cal.4th 450, 461-462.) We explained above that there was no evidence of heat of passion or provocation that would reduce murder to manslaughter. Where, as here, there is no evidence of a heat of passion killing caused by sufficient provocation, it is nonsensical to ask the jury to decide whether the defendant acted under provocation.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


ALDRICH, J.


We concur:



KITCHING, Acting P. J.




EGERTON, J.[*]

---

[*] Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.